IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| REBECCA HOLLAND NEW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19cv807 |
| | ) | |
| THERMO FISHER SCIENTIFIC, | ) | |
| INC., a corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

Plaintiff Rebecca Holland New brings this action against Defendant Thermo Fisher Scientific, Inc. ("Thermo") alleging sex discrimination and breach of contract, as well as failure to pay wages due, fraud, and conversion. Before the court is Defendant's motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 8.) The motion is fully briefed (Docs. 9, 11, 12) and is ready for decision. For the reasons set forth below, the motion to dismiss will be granted in part and denied in part.

I. **BACKGROUND**

A. **Facts**

The allegations of the complaint, along with the contents of documents of which the court takes judicial notice,[1] viewed in the

---

[1] The court may consider documents outside the pleadings without converting a motion to dismiss into one for summary judgment if those documents are "integral to and explicitly relied on in the complaint" and their authenticity is unchallenged. Copeland v. Bieber, 789 F.3d 484, 490 (4th Cir. 2015) (quoting Phillips v. LCI Int'l, Inc., 190 F.3d

light most favorable to New, show the following:

On approximately August 15, 2011, New, a Wake County, North Carolina resident, was employed with Patheon Pharmaceuticals Services, Inc. ("Patheon") as a Senior Vice president, Human Resources. (Doc. 1 ¶¶ 6, 10-11.) Around August 29, 2017, Defendant Thermo acquired Patheon N.V., Patheon's parent company, and New became employed by Thermo. (Id. ¶ 12.) By that time, New's job title and responsibilities within Patheon had been elevated to Executive Vice President, Enterprise Operations. (Id. ¶ 11.) Rather than exercise her options under a Change in Control provision in her contract with Patheon, which would have entitled her to substantial severance, bonuses, and other benefits, New accepted Thermo's offer to stay on as a Group Vice President, Enterprise-Wide Operations. (Id. at 4-5; Doc. 1-1 at 23.) In her new role with Thermo, she reported to Michel Lagarde, the Senior Vice President and President, Contract Development and Manufacturing, and had a base salary of $405,000 annually. (Doc. 1-1 at 23.) Upon starting with Thermo, New's responsibilities included business management, project management, and client experience management, as well as the management of the vendor relationship with Cognizant, a client, and the integrated business

---

609, 618 (4th Cir. 1999)). New relies on thirteen exhibits attached to her complaint to support her claim (Doc. 1-1) and the exhibits' authenticity is unchallenged.

sales and program support of small clients. (Doc. 1 ¶ 23.)

The terms of New's employment were set out in three different documents which, taken together, establish the contractual relationship between her and Thermo. (Id. ¶ 14.) In an August 17, 2017 letter agreement, signed by New on August 28, 2017 (Doc. 1-1 at 23-25), the parties agreed that New's initial employment agreement with Patheon (Doc. 1-1 at 1-22) would "remain largely in effect." (Doc. 1-1 at 23.) Her employment agreement was further modified through a memorandum entitled "Outstanding Patheon Long-Term Incentive Awards for Rebecca Holland New." (Id. at 26.) The facts, viewed in the light most favorable to New, show that her contractual relationship with Thermo was defined by (1) her initial employment agreement with Patheon (Doc. 1-1 at 1-22), (2) the signed August 2017 letter agreement (Doc. 1-1 at 23-25), and (3) the long-term incentive awards memorandum (Doc. 1-1 at 26), (collectively, New's "Employment Agreement"). (Doc. 1 ¶ 14.)

Subject to her Employment Agreement, New's unvested Patheon Stock Options and Restricted Stock Units ("RSUs") that were to vest upon the Change in Control "were converted to unvested Thermo Fisher Stock Options and RSUs 'subject to substantially the same terms and conditions (including vesting schedule)' as her unvested Patheon Stock Options and RSUs." (Id. ¶ 16.) Additionally, New's unvested Thermo Fisher Stock Options and RSUs were to vest immediately if she were terminated by Thermo "without Cause" or if

3

New resigned her employment "with Good Reason." (Id. ¶ 17.) Moreover, if New was terminated for a reason other than for Cause or if she terminated her employment for "good reason," Thermo had to pay her an amount equal to twelve months of base salary, performance bonuses, plus any other amounts or benefits she was eligible to receive. (Id. ¶ 18.) However, to recover these severance benefits, New was required to submit a form releasing Thermo from all current and future claims, both known and unknown. (Doc. 1-1 at 12.) New's Employment Agreement also provided that she would "continue to be eligible for severance in accordance with the terms of [her] Employment Agreement for two years from Closing" and that her "other current benefit and executive perquisite offerings, excluding [her] severance benefits, will be unchanged for at least one year from Closing." (Doc. 1 ¶ 19.)

The terms "Cause" and "Good Reason" are defined in New's employment agreement as follows:

> "**Cause**" means the determination, in good faith, by the Company, after notice to the Executive that one or more of the following events has occurred: (i) the Executive has failed to perform her material duties and, if curable, such failure has not been cured after a period of thirty (30) days' notice from the Company; (ii) any reckless or grossly negligent act by the Executive having the effect of injuring the interests, business, or reputation of any member of the Patheon Group in any material respect; (iii) the Executive's commission of any felony (including entry of a *nolo contendere* plea); (iv) any misappropriation or embezzlement of the property of any member of the Patheon Group; or (v) a breach of any material provision of this agreement by the Executive, which breach, if curable, remains uncured

4

for a period of thirty (30) days after receipt by
Executive of notice from the Company of such breach.

* * *

**"Good Reason"** means the occurrence of any of the
following events without the consent of the Executive:
(i) a material reduction of the Executive's duties or
responsibilities that is inconsistent with the
Executive's position as described in this Agreement
(i.e. that would result in a de facto reduction in rank)
or a change in Executive's reporting relationship such
that Executive no longer reports directly to the Chief
Executive Officer; (ii) a material breach by the Company
of this Agreement, or (iii) a requirement by the Company
that the Executive work more than fifty (50) miles from
Executive's principle office. A termination of the
Executive's employment by Executive shall not be deemed
to be for Good Reason unless (i) the Executive gives
notice to the Company of the existence of the event or
condition constituting Good Reason within thirty (30)
days after such event or condition initially occurs or
exists, (ii) the Company fails to cure such event or
condition within thirty (30) days after receiving such
notice, and (iii) the Executive's "separation from
service" within the meaning of Section 409A of the Code
occurs not later than ninety (90) days after such event
or condition initially occurs or exists.

(Doc. 1-1 at 4-5.) Notices and other communications between New

and Thermo were to be in writing and either hand delivered or

delivered by registered or certified mail with postage prepaid and

a return receipt requested. (Id. at 15.) The agreement further

provided that "[n]otice and communications shall be effective when

actually received by the addressee." (Id.)

New met with Michel Lagarde on July 16, 2018, to express her

concern that Thermo, and Lagarde himself, were diminishing her

role within the company.[2]  (Doc. 1 ¶ 72.)  At this meeting, Lagarde admitted that he was diminishing New's role, that he had no role for her in his organization, and that he would try to find another position for her elsewhere.  (Id. ¶¶ 72, 73.)  The following day, New met with Mike Jewett, the head of Human Resources for Pharma Services Group.[3]  (Id. ¶ 76.)  At this meeting, Jewett told New "they were looking to find other roles for her" and he recognized that Lagarde "stated that there was not a role for New in the PSG organization."  (Id.)  On July 20, 2018, New was advised that Lagarde had removed her from further involvement in a major merger and acquisition project that she had previously led.  (Id. ¶ 77.)

On July 23, 2018, New's legal counsel sent a letter to Thermo via email and U.S. First Class Mail "in accordance with the 'Good Reason' provision in her Employment Agreement."  (Id. ¶ 78; Doc. 11 at 7.)  The letter identified an alleged significant change in New's reporting relationship in that she no longer reported to Lagarde.  Further, material reductions in her duties and responsibilities had taken place, including "the recent elimination of her role and involvement in leading mergers and

---

[2] The complaint also contains allegations that New was discriminated against by a male employee based on her sex as well as subjected to a hostile work environment.  Because the claims based on those facts are not the subject of a pending motion, the court refrains from discussing them.

[3] Pharma Services Group ("PSG") is a division of, or affiliate operation owned and operated by, Thermo.  (Doc. 1 ¶ 7.)

6

acquisitions, shifting of responsibilities of carve-outs to peers, the removal of the integration lead as a direct report and elimination of the function and role, [and] elimination of project management office responsibilities including management of Cognizant and outsourced operations." (Doc. 1-1 at 136.) The letter also stated that New and her legal counsel "would like to open a constructive dialogue to discuss [New's] transition period and transfer of information and responsibilities, and her severance benefits." (Id.)

New was told that there was a job for her, and on August 22, 2018, New's supervisor "provided [her] with an August 16, 2018 letter signed by Jewett advising that her current position with the Company was being limited to 'Business Management' only and lowered to a Vice President level." (Docs. 1 ¶ 83; 1-1 at 138.) The 30-day "cure period" that was triggered by the July 23, 2018 letter from New's counsel expired in late August, and on August 27, 2018, New's counsel emailed Thermo's counsel suggesting they discuss a separation arrangement. (Doc. 1 ¶¶ 85, 87.) On September 5, 2018, New was offered a future position outside of the PSG group with Biologics, but this position would require her to relocate and would result in reductions in title, band level, responsibility, and compensation. (Id. ¶ 89.) New rejected this offer the following day, and her counsel sent correspondence to Thermo's counsel indicating that the offer was rejected and that

7

New would be leaving the company effective November 2, 2018. (Id. ¶ 92.) Thermo's counsel responded the same day, informing New's counsel that New had no "Good Reason" to leave Thermo. (Id.)

On September 17, 2018, New spoke with Jewett, who acknowledged that New expected the Employment Agreement to be honored and told her he would be back in touch with a separation agreement. (Id. ¶ 94.) Jewett followed up with New a few days later, giving her until September 24, 2018, to accept a limited severance offer of $200,000 with no bonus payments. (Id. ¶¶ 95, 96.) In his correspondence, Jewett informed New that "the Company had made a mistake changing (lowering) her title, band level, compensation opportunities and responsibility in his August 16, 2018 letter." (Id. ¶ 96.) New's counsel sent a letter to Thermo's counsel outlining some of the issues New had encountered at the company and advising that New would be terminating her employment effective October 5, 2018. (Id. ¶ 102.) On October 5, 2018, New left Thermo. (Id. ¶ 103.) New never received the severance benefits outlined in her Employment Agreement, and her stock options and RSUs that were to vest immediately upon her termination by Thermo without Cause, or by New with Good Reason, were removed from her investment account. (Id. ¶¶ 106, 107.)

**B.  Procedural History**

New filed an eight-count complaint on August 7, 2019, alleging the following: Unlawful Sex Discrimination and

8

Harassment, in violation of Title VII, 42 U.S.C. § 2000e-2(a) (Count I); Hostile and Abusive Working Environment, in violation of Title VII (Count II); Unlawful Retaliation, in violation of 42 U.S.C. § 2000e-3(a) (Count III); Breach of Contract regarding Severance and Other Benefits (Count IV); Breach of Contract regarding Stock Options and RSU's (Count V); Conversion (Count VI); Fraud (Count VII); and Failure to Pay Wages and Benefits when Due, in violation of the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et seq. (Count VIII). On September 30, 2019, along with its answer to New's complaint (Doc. 10), Thermo filed the present motion to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 8). The motion was briefed (Docs. 9, 11, 12) and is now ready for decision.

## II.  ANALYSIS

Jurisdiction and venue are not contested issues and are proper.  New correctly argues that this court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  (Doc. 1 ¶ 2.) New further asserts jurisdiction stemming from 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).  (Id. ¶ 3.)  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).  Further, the parties consented to jurisdiction and venue in this court in their Employment Agreement.  (Doc. 1-1 at 3.)

9

## A. Motion to Dismiss Standard

Thermo moves to dismiss five of the eight counts in New's complaint pursuant to Rule 12(b)(6), arguing that she has failed to state a claim upon which relief can be granted. (Doc. 8.) A motion to dismiss under Rule 12(b)(6) is meant to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering the motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). "Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations 'to raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'" Sauers v. Winston-Salem/Forsyth Cty. Bd. of Educ., 179 F. Supp. 3d 544, 550 (M.D.N.C. 2016) (alterations in original) (quoting Twombly, 550 U.S. at 555). Mere legal conclusions are not accepted as true,

10

and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

## B. Breach of Contract

New raises two breach of contract claims in her complaint: first, as it relates to severance and other benefits; and second, as it relates to her stock options and RSUs. (Doc. 1 at 34-37.) Thermo moves to dismiss, arguing that New failed to comply with the contractual prerequisites to claiming "Good Reason." Thermo contends that New failed to timely and properly provide notice of an alleged "Good Reason" for termination, that the July 23, 2018 letter from New's counsel was deficient, and that New failed to produce a signed release of claims form as required by the Employment Agreement. (Doc. 9 at 10-13.) Thermo further argues that even if New provided proper notice, she failed to plausibly allege a "material reduction" in her position, duties, or responsibilities. (Id. at 14.) Finally, Thermo contends that there is no legal basis for New alleging constructive discharge and that she cannot seek contractual damages without abiding by the terms of the contract herself. (Id. at 17.)

New opposes Thermo's motion to dismiss, arguing that her "Good Reason" and "Termination" notices were both timely and sufficient. (Doc. 11 at 13-14.) She argues that her notice provided Thermo with an opportunity to cure the problems it had created and that

Thermo's claim that she failed to offer a signed release is disingenuous. (Id. at 15-17.) Finally, New contends that Thermo materially reduced her duties and responsibilities to the point of eliminating her position altogether and that she was constructively terminated within the meaning of her Employment Agreement. (Id. at 18-20.) In response, Thermo reiterates that New failed to provide timely notice, failed to serve notice in compliance with her Employment Agreement, and failed to give Thermo an opportunity to cure any alleged reductions in responsibilities. (Doc. 12 at 3-5.) Further, it argues, Thermo's denial of New's demand for severance benefits was not a repudiation entitling her to ignore the Employment Agreement, she never identified any material reductions in her duties, and there was no constructive discharge. (Id. at 6-8.)

To succeed in a breach of contract claim, a plaintiff must show "(1) existence of a valid contract, and (2) breach of the terms of that contract." Sanders v. State Personnel Comm'n, 677 S.E.2d 182, 187 (N.C. Ct. App. 2009) (quoting Toomer v. Garrett, 574 S.E.2d 76, 91 (2002)) (internal quotation marks omitted). In interpreting contracts, North Carolina courts employ the following rules of construction:

> [T]he goal of construction is to arrive at the intent of
> the parties when the [contract] was issued. Where a
> [contract] defines a term, that definition is to be used.
> If no definition is given, non-technical words are to be
> given their meaning in ordinary speech, unless the

context clearly indicates another meaning was intended. The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect.

Singleton v. Haywood Elec. Membership Corp., 588 S.E.2d 871, 875 (N.C. 2003) (quoting Gaston County Dyeing Machine Co. v. Northfield Ins. Co., 524 S.E.2d 558, 563 (N.C. 2000)). "Whether a failure to perform a contractual obligation is so material as to discharge other parties to the contract from further performance of their obligations thereunder is a question of fact which must be determined by the jury or . . . by the trial court without a jury." Combined Ins. Co. of Am. v. McDonald, 243 S.E.2d 817, 820 (N.C. Ct. App. 1978). Further, "if one party to the contract renounces it, the other may treat renunciation as a breach and sue for . . . damages at once, provided the renunciation covers the entire performance to which the contract binds the promisor." Cook v. Lawson, 164 S.E.2d 29, 32 (N.C. Ct. App. 1968) (citing Pappas v. Crist, 25 S.E.2d 850, 852 (N.C. 1943)). This, too, is a question to be determined by the jury. Id.

The terms of New's Employment Agreement establish that she is entitled to contractual benefits if she terminates her employment for "Good Reason" or if Thermo terminates her employment without "Cause." (Doc. 1-1 at 4-5.) In either situation, notice must be provided in accordance with the agreement (id. at 15), and to recover severance benefits, New must submit a signed release of

13

claims form (id. at 11-12). Finally, New is "eligible for severance in accordance with the terms of [her] Employment Agreement for two years from Closing," and her other benefits under the agreement will remain unchanged for one year following the closing date. (Doc. 1 ¶ 19.) Before New could terminate her employment for "Good Reason," she was required to notify Thermo of a material reduction in her duties or responsibilities and give it thirty days to cure. Further, she was required to leave the company within ninety days after the issue or condition initially occurred. New's employment was terminated on October 5, 2018, and she alleges that her July 23, 2018 communication with Thermo was her notice of a material reduction in her work, triggering the thirty-day cure period. Given the requirement that New notify Thermo within thirty days of an issue constituting "Good Reason" and terminate her employment within ninety days of making Thermo aware, she must plausibly allege that a material reduction occurred between July 7, 2018 (ninety days prior to her termination) and July 23, 2018 (the date of her notice to Thermo), and New must have had until August 22, 2018 to cure.

New points to her July 16, 2018 meeting with Jewett as evidence of a material reduction in her role. But as alleged in her complaint, this meeting was to discuss previous reductions in her role that had taken place prior to July 7, 2018. These alleged reductions included the change in her reporting structure (Doc. 1-

14

1 at 152), the reduction in her responsibilities over mergers and acquisitions (Doc. 1 ¶¶ 52-54), the taking away of her headcount (id. ¶¶ 59, 61), and the removal of New's work on Shared Services (id. ¶ 62.) And while New was allegedly told she had no role in the organization, she was also told that other roles were being contemplated for her. (Id. ¶ 76.) Whether or not these qualify as grounds, on July 20, 2018, New was removed from a major merger/acquisition project. (Id. ¶ 77.) In the "Good Reason" letter from New's counsel, one of the alleged material reductions was "the recent elimination of [New's] role and involvement in leading mergers and acquisitions." (Doc. 1-1 at 136.) Thermo argues that New had not worked on this particular merger since 2017, citing New's complaint. (Doc. 9 at 16.) Viewing the facts in the light most favorable to New, she has properly alleged a material reduction in her role occurring within the timeframe mandated by the Employment Agreement. Given this notice of material reduction, Thermo was required to cure the issue by August 22, 2018. But rather than cure, Thermo informed New on August 22 that her role within the company was "being limited to 'Business Management' only and lowered to a Vice President level." (Doc. 1 ¶ 83.)

Thermo contends that it had no opportunity to cure, pointing to the request in the "Good Reason" letter to "resolve the issues related to [New's] end of employment" (Doc. 9 at 6), but the

15

letter, entitled "Good Reason Termination of Employment Agreement of Rebecca Holland New," calls for a dialogue (Doc. 1-1 at 136). Viewing this communication in the light most favorable to New, and taking into account the document itself, the court finds that this plausibly alleges a "Good Reason" notice providing Thermo with an opportunity to cure.

As to notice, the Employment Agreement requires that communications be hand delivered or delivered by registered or certified mail with postage prepaid and a return receipt requested but provides further that "[n]otice and communications shall be effective when actually received by the addressee." (Doc. 1-1 at 15.) New focuses on the latter language to argue that her notice was effective because it was actually received and acted on by Thermo. (Doc. 11 at 4.) Thermo contends that the notice was defective under the express terms of the agreement. To be sure, nothing in the Employment Agreement indicates that actual receipt excuses a failure to observe the mandated delivery requirements. However, whether one party's failure to abide by the terms of a contract excuses the other party from performing its obligations is a question of materiality and is left to the finder of fact. At minimum, viewing the facts in the light most favorable to New, she has stated a claim upon which relief can be granted. If a factfinder determines that the notice provisions were not material, then Thermo's alleged subsequent failure to perform its

16

contractual obligations would give rise to a breach of contract claim.  Thermo's motion to dismiss as to New's stock options and RSUs (Count V) will therefore be denied.

As to the contractual prerequisites to receive severance benefits, New does not allege that she turned over an executed release to Thermo as required under the Employment Agreement.  She does allege that Thermo repudiated the Employment Agreement by telling her and her counsel on multiple occasions that she would not receive her contract benefits.  (Doc. 1 ¶¶ 73, 92, 95-96; Doc. 1-1 at 147, 149-150; Doc. 11 at 17.)  New claims that once Thermo repudiated the Employment Agreement, she was "free to sue for all of her contract benefits immediately."  (Doc. 11 at 17.)  In response, Thermo argues that "[j]ust because [it] informed [New] that it disagreed with her position that there was 'Good Reason' and would not roll over and pay [her] an additional $1.2 Million upon demand . . . does not mean [it] repudiated the Agreement."  (Doc. 12 at 6.)  Whether Thermo's statements that New was not going to receive her contractual benefits constituted a repudiation allowing New to sue for breach of contract is a question for the factfinder and is not a finding to be made at this stage.  See Cook, 164 S.E.2d at 32 ("We hold that plaintiff was entitled to have the jury pass upon his allegations [of repudiation] and evidence of breach of contract.")  Viewing the facts in the light most favorable to New, then, she has stated a claim upon which

relief can be granted, and Thermo's motion to dismiss her claim as to her severance benefits (Count IV) will be denied.[4]

### C. Conversion

In her complaint, New alleges that Thermo "wrongfully converted [her] vested Stock Options and RSUs by removing them, or causing their removal, from [her] Fidelity account" and "effectively prevent[ed] [her] from exercising her vested Stock Options and RSUs in accordance with the terms and conditions of the Employment Agreement." (Doc. 1 ¶¶ 153, 154.) Thermo moves to dismiss, arguing that New "did not voluntarily terminate her employment for 'Good Reason' and therefore cannot show the Severance Benefits are 'property belonging to another' (i.e., Plaintiff)," citing Lockerman v. S. River Elec. Membership Corp., 794 S.E.2d 346, 354 (N.C. Ct. App. 2016). (Doc. 9 at 19.) Ultimately, it argues, because New "cannot show that the Severance Benefits were hers, or that Thermo Fisher wrongfully deprived her of them, her Conversion claim fails and should be dismissed with prejudice." (Id.) In opposing Thermo's motion, New argues that its "entire argument regarding conversion is that New's contract benefits were not 'property belonging' to her because she was not owed those amounts under her Employment Agreement," a contention

---

[4] Because New has sufficiently alleged that she had "Good Reason" under the Employment Agreement, the court need not address Thermo's argument as to constructive discharge.

18

that she asserts is false.  (Doc. 11 at 20.)

In North Carolina, a claim for conversion requires "(1) an unauthorized assumption and exercise of right of ownership over property belonging to another and (2) a wrongful deprivation of it by the owner, regardless of the subsequent application of the converted property."  Lockerman, 794 S.E.2d at 354 (quoting N.C. State Bare v. Gilbert, 663 S.E.2d 1, 4 (N.C. Ct. App. 2008)). Generally, there is no conversion until an act is done in violation of the plaintiff's dominion over or rights in the property. Gallimore v. Sink, 218 S.E.2d 181, 183 (N.C. Ct. App. 1975) (citation omitted).  "After an act of conversion has become complete, an offer to return or restore the property by the wrongdoer will not bar the cause of action for conversion."  Wall v. Colvard, Inc., 149 S.E.2d 559, 564 (N.C. 1966) (citation omitted).

Thermo's argument primarily rests on its belief that New cannot show that she was entitled to her Stock Options and RSUs under the Employment Agreement.  But the court has found that New alleged sufficient facts to state a claim for breach of contract. She has alleged that the Stock Options and RSUs in the Employment Agreement belonged to her and were removed from her investment account by, or at the direction of, Thermo.  If New successfully shows that Thermo breached the Employment Agreement and that she was entitled to the Stock Options and RSUs that were to vest upon

19

her termination, then a conversion claim may be maintained. Consequently, New has alleged sufficient facts to state a claim for conversion, and Thermo's motion to dismiss the conversion claim (Count VI) will be denied.

### D. Fraud

In Count VII of her complaint, New alleges that Thermo made fraudulent and false misrepresentations "[i]n an effort to induce [her] to accept employment" with Thermo and forego the "immediate vesting of her unvested Patheon Stock Options and RSUs," her severance benefits, and her other employment opportunities. (Doc. 1 ¶¶ 157-59.) New alleges that she relied on these misrepresentations and, as a result, suffered emotional distress, mental anguish, and economic damages. (Id. ¶¶ 160, 161.) Thermo moves to dismiss, arguing that New has "failed to sufficiently plead the elements of her claim with particularity." (Doc. 9 at 21.) Thermo argues that New failed to plausibly allege that Thermo made a false representation or concealed a material fact, or that the "non-existent false representation was 'reasonably calculated to deceive' or 'made with intent to deceive,'" citing Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007). (Id. at 22.) It argues New cannot show that she suffered any damages from the alleged fraudulent or false misrepresentations. (Id.) New opposes the motion, contending that she adequately pleaded a fraud claim, that the allegations in her complaint are detailed, and that she

did in fact suffer damages. (Doc. 11 at 22-23.) In response, Thermo argues that New "bases her Fraud claim upon the sole allegation that, '[Thermo] represented to New that her services were very much needed by [Thermo], that her position would not change and that her position would not be eliminated,'" and argues that she has failed to allege who made these statements and failed to acknowledge that the Employment Agreement only protected her role from material reductions for a term of twelve months. (Doc. 12 at 9.)

In cases alleging fraud, a plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Procedurally, a failure to comply with Rule 9(b) is treated as a failure to state a claim under Rule 12(b)(6). Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783 n.5 (4th Cir. 1999). To meet the requirements of Rule 9(b), the plaintiff must sufficiently describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008) (quoting Harrison, 176 F.3d at 784). This minimum factual description is "often referred to as the who, what, when, where, and how of the alleged fraud." Id. (citation and internal quotation marks omitted). In cases where a fraud claim incorporates by reference the prior allegations in the

21

complaint, the entire complaint is examined to determine whether the pleading requirements of Rule 9(b) are satisfied. <u>Adkins v. Crown Auto, Inc.,</u> 488 F.3d 225, 232 (4th Cir. 2007). "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." <u>Harrison</u>, 176 F.3d at 784.

While the particularity requirement is governed by Federal Rule of Civil Procedure 9(b), substantive State law governs the elements necessary to meet the standard. See <u>Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP</u>, 394 F. Supp. 2d 762, 772 (M.D.N.C. 2005) (citation omitted) ("[T]he law of the state in which the Court sits will control the content of the elements of the fraud claim. The specificity of the allegations as required by state law affects the pleading requirements under Rule 9(b).").  In North Carolina, to state a claim for actual fraud, a plaintiff must allege: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." <u>Forbis v. Neal</u>, 649 S.E.2d 382, 387 (N.C. 2007) (quoting <u>Ragsdale v. Kennedy</u>, 209 S.E.2d 494, 500 (N.C. 1974)).  Reliance on the allegedly false representations must be reasonable, and that reasonableness is a question for the

22

jury, "unless the facts are so clear that they support only one conclusion." Id. (citations omitted).

In stating her fraud claim, New has incorporated by reference all prior allegations in her complaint. (Doc. 1 ¶ 156.) Therefore, the court must examine all the preceding allegations to determine if she has met her pleading requirement. The alleged false statements, which New claims were made by Thermo, are that New's "services were needed by the Company, her position would not change and her position would not be eliminated." (Id. ¶ 157.) She does sufficiently allege falsity at the time and intent – to induce her to forego contract benefits to which she was then entitled. Her allegations detailing the alleged continuous reduction of her responsibilities within the company and the indication that she had no role with the company moving forward support her intent allegations. And she has alleged that as a result of Thermo's intentional misrepresentations she lost the contract benefits under her employment agreement with Patheon and other employment opportunities, all in excess of $1,000,000. To this extent, the alleged fraud is described with sufficient particularity to assist Thermo in preparing a defense.

However, New fails to allege who made these representations, where, and when. She argues that identifying Thermo generally as the person making the material misrepresentation in the contract satisfies Rule 9(b)'s "who" requirement. But the cases upon which

23

she relies are distinguishable, allowing that it can be the case if the facts support the reasonable inference that the source of the corporate statement can readily be found. See McCauley v. Home Loan Inv. Bank, F.S.B., 710 F.3d 551, 559 (4th Cir. 2013) (attributing an allegedly false statement to appraisal by Home Loan Investment Bank, F.S.B.); Anderson, 508 F.3d at 189 (in class action, attributing to corporate defendant allegedly false statements, at the time of hiring, to pay all employees all compensable time under the Fair Labor Standards Act). New's complaint does not allege who made the statement, when (other than presumably before her employment with Thermo (Doc. 1 ¶ 13 ("[i]n an effort to induce New to accept employment")), or where it was made. These facts are critical, as she alleges fraud in the inducement. Therefore, Thermo's motion to dismiss New's fraud claim (Count VII) will be granted. But because this defect can be cured by amendment, the motion will be granted without prejudice. See Armstrong v. City of Greensboro, No. 1:15CV282, 2016 WL 1312037, at *3 (M.D.N.C. Mar. 31, 2016) (dismissing a claim without prejudice when further evidence "could warrant Plaintiff seeking leave to file an amended complaint").

### E. North Carolina Wage and Hour Act Claim

New alleges that given the circumstances of her termination, she was entitled to severance pay, bonuses, and other benefits under the Employment Agreement and that Thermo failed to deliver

24

those benefits. (Doc. 1 ¶ 164, 165.)   New alleges that her "severance pay, bonuses and other benefits and [her] vested [Thermo] Stock Options and RSUs constitute wages due, and [Thermo] failed to pay [her] all wages due upon the termination of her employment in violation of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. §§ 95-25.1 et seq." (Id. ¶ 166.)  She further alleges that she is "entitled to recover all amounts owed to her for her vested [Thermo] Stock Options and RSUs and her severance pay, bonuses and other benefits . . . plus liquidated damages, interest at the legal rate from the date or dates those amounts were required to be paid, and reasonable attorney's fees." (Id. ¶ 168.)

Thermo moves to dismiss, arguing that New "cannot bring a claim under the NCWHA for contract benefits she had not 'earned.'" (Doc. 9 at 20.)   Thermo argues that New earned neither the severance benefits which include payment of a year's salary to cover the year following her termination, as well as bonuses and benefits, nor the value of the stock options and RSUs because they would not have vested until years in the future if Plaintiff had remained employed.  (Id. at 20-21.)   Finally, Thermo argues that even if New could proceed under a theory that these future amounts were earned and constitute wages, her claim would still fail because "a) she cannot show that she complied with the contractual prerequisites of the Amended Patheon Agreement; b) she cannot show

25

that she voluntarily resigned her employment for Good Reason; and c) she <u>cannot</u> show that she is entitled to the Severance Benefits she seeks." (<u>Id.</u> at 21.) New opposes the motion to dismiss, arguing that her contract benefits "are clearly wages due upon termination" and that she has "performed all services necessary to earn them." (Doc. 11 at 21.)

The NCWHA defines "wage" as "compensation for labor or services rendered by an employee whether determined on a time, task, piece, job, day, commission, or other basis of calculation" and provides that "[f]or the purposes of G.S. 95-25.6 through G.S. 95-25.13 'wage' includes sick pay, vacation pay, severance pay, commissions, bonuses, and other amounts promised when the employer has a policy or a practice of making such payments." N.C. Gen. Stat. § 95-25.2(16). Further, "[e]very employer shall pay every employee all wages . . . accruing to the employee on the regular payday" and "[w]ages based upon bonuses, commissions, or other forms of calculation may be paid as infrequently as annually if prescribed in advance." <u>Id.</u> § 95-25.6. While the statutory definition of wages is "broad enough to include things like 'sick pay' 'bonuses' or 'other amounts promised,' such items are compensable only if the employee has actually worked the hours to earn the wages." <u>Whitley v. Horton</u>, 608 S.E.2d 416 (N.C. Ct. App. 2005) (table).

The court has found that New has alleged sufficient facts to

26

state a claim for breach of contract. Therefore, any argument against her NCWHA claim predicated on her failure to comply with the Employment Agreement or her failure to demonstrate that she was entitled to contractual benefits fails. The only remaining question is whether the contractual benefits New is seeking to recover are earned wages. Given the NCWHA's definition of wages and the terms of the Employment Agreement, New has alleged facts sufficient to maintain an action under the NCWHA. The Employment Agreement provided that New would receive the contractual benefits if she terminated her employment for "Good Reason" and complied with the other terms of the contract, including the notice and timeliness provisions. To earn these benefits, New simply had to comply with the terms of her agreement with Thermo. And viewing the facts in the light most favorable to New, as the court must do at this stage, she has alleged sufficient facts demonstrating that she complied with the contractual terms and has thus "earned" the benefits. See Hamilton v. Memorex Telex Corp., 454 S.E.2d 278, 282-83 (N.C. Ct. App. 1995) (finding that an employer's failure to pay wages for future vacation days was a violation of the NCWHA when the employees had complied with the requisite terms of the employment agreement). While New cannot pursue unearned contractual damages under the NCWHA, Whitley, 608 S.E.2d 416, she can state a claim under the act as it relates to any earned wages. See, e.g., Myers v. Roush Fenway Racing, LLC, No. 1:09CV508, 2009

27

WL 5215375, at *5 (M.D.N.C. Dec. 28, 2009), <u>report and</u> <u>recommendation adopted in part, rejected in part</u>, No. 1:09CV508, 2010 WL 2765378 (M.D.N.C. July 12, 2010) ("Finally, to the extent that Plaintiff contends that the Wage and Hour Act can be 'reasonably interpreted' to allow him to recover unearned, contractual damages, this court is bound to apply the Act as it has been interpreted by the North Carolina courts. The North Carolina courts have consistently interpreted the Act to exclude recovery of future, unearned wages."). Because New has pleaded sufficient facts to state a claim under the NCWHA, Thermo's motion to dismiss Count VIII will be denied.

## III. CONCLUSION

For the reasons stated above,

IT IS THEREFORE ORDERED that Defendant's motion to dismiss (Doc. 8) is GRANTED as to Count VII of New's Complaint (Doc. 1), which is DISMISSED WITHOUT PREJUDICE, but is otherwise DENIED.

<u>  /s/   Thomas D. Schroeder</u>
United States District Judge

August 7, 2020

Case 1:19-cv-00807-TDS-LPA   Document 13   Filed 08/07/20   Page 28 of 28