IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

REBECCA HOLLAND NEW,         )
                            )
          Plaintiff,        )
                            )
     v.                     )      1:19cv807
                            )
THERMO FISHER SCIENTIFIC,   )
INC., a corporation,        )
                            )
          Defendant.        )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Plaintiff Rebecca Holland New brings this action against Defendant Thermo Fisher Scientific, Inc. ("Thermo") alleging breach of contract, sex discrimination, and other claims arising from her employment and resignation. Before the court is Thermo's motion for summary judgment. (Doc. 73.) The motion is fully briefed (Docs. 86, 87, 90) and the court heard argument on it on February 3, 2022. For the reasons set forth below, the motion will be granted and the action will be dismissed.

## I.   BACKGROUND

### A.   Facts

The facts, either not in dispute or viewed in the light most favorable to New as the non-moving party, establish the following:

#### 1.   Employment Agreement with Thermo

On August 15, 2011, New was employed by Patheon Pharmaceuticals Services, Inc. ("Patheon") as a Senior Vice

President, Human Resources. (Doc. 1-1 at 2.)[1] Over time, she transitioned to the head of Patheon's newly-established Global Business Management function, "designed to deliver a better customer experience and improve coordination across our business units," as Executive Vice President, Enterprise-Wide Operations. (Docs. 86-5 at 2-3; 86-6 at 3.) In this role, New ceased reporting directly to Chief Executive Officer ("CEO") Jim Mullen and reported to an intermediary, Michel Lagarde, President and Chief Operating Officer. (Docs. 86-5 at 3; 86-7 at 2.) Lagarde selected New to oversee business management because she was "significantly talented" and "an excellent candidate" to become an "effective . . . business leader." (Doc. 87-63 at 14:9-15:6.)

On August 29, 2017, Defendant Thermo acquired Patheon N.V., Patheon's parent company, and New became employed by Thermo. (Doc. 87-3 ¶ 2.) Rather than exercise her options under a change-in-control provision in her employment contract, which would have entitled her to depart with substantial severance, bonuses, and other benefits, New accepted Thermo's offer to stay on as a Group Vice President, Enterprise-Wide Operations for Thermo's Pharma Services Group ("PSG").[2] (Id.; Doc. 1-1 at 23.) According to New,

---

[1] All citations to the record are to the paragraph number or ECF docket page except for testimony, which is cited to the deposition transcript page and line number.

[2] PSG is a division of, or affiliate operation owned and operated by, Thermo. New claims she accepted employment with Thermo, at least in

Martin Van Walsum, Thermo's Vice President of Executive Compensation, told her that she would be "banded" at a compensation level of 13 under Thermo's structure.[3] (Docs. 87-59 at 23:23-24:7; 87-66 at 172:21-173:10.) New's offer letter from Thermo provided for an annual base salary of $405,000 and noted she would continue to report to Lagarde, who would be Thermo's Senior Vice President and President, Contract Development and Manufacturing. (Doc. 1-1 at 23.)

Upon starting with Thermo, New continued to oversee Global Business Management (described as managing contracts, client relations, demand planning, and expansion of business/upsell for over 850 company clients), which took up at least 80% of her responsibilities.[4] (Docs. 86-6 at 3; 86-16; 87-3 ¶ 6; 87-14 at 10; 87-66 at 60:22-61:2.) New coordinated the business management function across PSG's five business units. (Docs. 86-46 at 32:16-

---

part, based on Lagarde's representations that her "position would not be eliminated," "would not change," and she "was very much needed in the new organization." (Doc. 87-3 ¶ 2.) She also says that Lagarde stated that, although Thermo had a team for carve-outs and mergers and acquisitions, he still needed his "own internal deal team" to "evaluate some deals" before presenting them to Thermo's corporate M&A team. (Doc. 87-66 at 61:7-18.) Her only fraud claim, however, was dismissed without prejudice (Doc. 13) and has not been repleaded.

[3] "Band" levels were Thermo's method of assigning special benefits to various executive positions and employees – the greater the band, the greater the benefits. (See Doc. 87-66 at 173:4-16.) In her deposition, New testified that "there was not clarity in terms of . . . the benefits [between band] levels." (Id. at 172:16-20.)

[4] According to Lagarde, "98% of [New's] responsibilities was Global Business Management." (Docs. 87-14 at 8; 86-43 at 48:15-49:1.)

3

20; 87-3 ¶ 6.)   She also maintained other responsibilities, including "Shared Services" (managing the vendor relationship with Cognizant, a company that provided back office support operations); the "Project Management Office" (supporting Mergers & Acquisitions ("M&A"), Carve Outs, Integrations, and Strategic Projects); "OneSource" (managing integrated business sales and project management support for small clients); and "Client Experience Management" (remediation planning and improved training and communication tools to help improve client relationship management).   (Docs. 87-3 ¶ 6; 86-46 at 33:25-34:9, 34:25-35:6.) Additionally, Thermo asked her to remain on PSG's Global Leadership Team ("GLT").   (Docs. 86-17; 87-62 at 187:8-13.)   New was also one of only four PSG executives selected by Thermo to participate in the Global Leadership Program, a selective leadership development program.   (Docs. 86-19; 86-20.)

Following the acquisition, New heard rumors of plans to "layer" her position and add a reporting level between her and Lagarde, which Lagarde denied.   (Doc. 86-46 at 50:12-25.)   However, in December 2017, Lagarde made an organizational change by adding the position of President of Commercial Operations.   (Doc. 86-16.) As a result, New, as the head of Global Business Management, and other executives began reporting to Franco Negron, the new President of Commercial Operations, who then reported to Lagarde effective January 2018.   (Id.; Docs. 86-43 at 28:21-29:4, 31:1-3;

4

86-46 at 51:3-7.)  While there were other reporting changes, New was the only one of Lagarde's direct reports whose reporting relationship was changed.  (Doc. 87-63 at 30:3-8.)

## 2. New's Employment Agreement

The terms of New's employment were set out in three different documents which, taken together, establish the contractual relationship between her and Thermo.  (Doc. 87-3 ¶ 5.)  In an August 17, 2017 letter agreement, signed by New on August 28, 2017 (Doc. 1-1 at 23-25), the parties agreed that New's initial employment agreement with Patheon (Doc. 1-1 at 1-22) would "remain largely in effect."  (Doc. 1-1 at 23.)  Any aspects of her employment that were "inconsistent with specific terms" of her initial employment agreement with Patheon would be "governed by the terms of [the signed August 2017 letter agreement.]"  (Id.)  Her Employment Agreement was further modified through a memorandum entitled "Outstanding Patheon Long-Term Incentive Awards for Rebecca Holland New."  (Id. at 26.)  Viewed in the light most favorable to New, therefore, these documents show that her contractual relationship with Thermo was defined by (1) her initial employment agreement with Patheon (Doc. 1-1 at 1-22), (2) the signed August 2017 letter agreement (Doc. 1-1 at 23-25), and (3) the long-term incentive awards memorandum (Doc. 1-1 at 26), (collectively, New's "Employment Agreement").  (Doc. 13 at 3.)

New's unvested Patheon stock options and restricted stock

5

units ("RSUs") that were to vest upon the change in control (resulting from Thermo's purchase of Patheon) were converted to unvested Thermo stock options and RSUs "subject to substantially the same terms and conditions (including vesting schedule)" of her Employment Agreement.[5] (Doc. 1-1 at 26.) Additionally, New's unvested Thermo stock options and RSUs were to vest immediately if she were terminated by Thermo "other than for Cause" or if New resigned her employment for "Good Reason." (Id. at 102.) If New was terminated for a reason "other than for Cause," or if she terminated her employment for "Good Reason," Thermo had to pay her an amount equal to twelve months of base salary and earned stock options and RSUs. (Id. at 11.) To recover these severance benefits, New was required to submit a form releasing Thermo from all current and future claims, both known and unknown. (Id. at 12.) New's Employment Agreement also provided that she would "continue to be eligible for severance in accordance with the terms of [her] Employment Agreement for two years from Closing" and that her "other current benefit and executive perquisite offerings, excluding [her] severance benefits, will be unchanged for at least one year from Closing." (Id. at 24.)

The terms "Cause" and "Good Reason" are defined in New's employment agreement as follows:

---

[5] New also earned a cash payment in exchange for her vested stock options and RSUs as a result of the acquisition. (Doc. 1-1 at 26.)

**"Cause"** means the determination, in good faith, by the Company, after notice to the Executive that one or more of the following events has occurred: (i) the Executive has failed to perform her material duties and, if curable, such failure has not been cured after a period of thirty (30) days' notice from the Company; (ii) any reckless or grossly negligent act by the Executive having the effect of injuring the interests, business, or reputation of any member of the Patheon Group in any material respect; (iii) the Executive's commission of any felony (including entry of a *nolo contendere* plea); (iv) any misappropriation or embezzlement of the property of any member of the Patheon Group; or (v) a breach of any material provision of this agreement by the Executive, which breach, if curable, remains uncured for a period of thirty (30) days after receipt by Executive of notice from the Company of such breach.

\* \* \*

**"Good Reason"** means the occurrence of any of the following events without the consent of the Executive: (i) a material reduction of the Executive's duties or responsibilities that is inconsistent with the Executive's position as described in this Agreement (i.e. that would result in a de facto reduction in rank) or a change in Executive's reporting relationship such that Executive no longer reports directly to the Chief Executive Officer; (ii) a material breach by the Company of this Agreement, or (iii) a requirement by the Company that the Executive work more than fifty (50) miles from Executive's principle [sic] office. A termination of the Executive's employment by Executive shall not be deemed to be for Good Reason unless (i) the Executive gives notice to the Company of the existence of the event or condition constituting Good Reason within thirty (30) days after such event or condition initially occurs or exists, (ii) the Company fails to cure such event or condition within thirty (30) days after receiving such notice, and (iii) the Executive's "separation from service" within the meaning of Section 409A of the Code occurs not later than ninety (90) days after such event or condition initially occurs or exists.

(Id. at 4-5.)[6]

### 3. Lukas Utiger

While at Patheon and then Thermo Fisher, New was required to interact with Lukas Utiger, who was the president of another business unit of each company.[7]

From May through December 2017, while Utiger was Patheon's President of Europe, he worked with Sylvia Held, who was New's direct report. (Docs. 87-69 at 76:1-4; 87-3 at ¶ 10.) During this time, Utiger complained about Held's performance and rated her as "needs improvement" until New and others intervened, changing Held's rating to "meets expectations." (Docs. 87-3 ¶ 10; 87-69 at 76:5-23.) Later, Lagarde directed New to replace Held based on Utiger's complaints. (Doc. 87-66 at 164:6-14.) Utiger

---

[6] The Employment Agreement required that notices and other communications between New and Thermo be in writing and either hand delivered or delivered by registered or certified mail with postage prepaid and a return receipt requested. (Doc. 1-1 at 15.) Notice and communications were effective "when actually received by the addressee." (Id.) While Thermo contested proper notice earlier in the case (Doc. 13 at 11-16), it has not raised any compliance question in the present motion.

[7] The record is unclear whether and for how long Utiger and New were peers. New claims the two were "peers" when they both reported directly to Lagarde, prior to her reporting line change. (Doc. 87-3 ¶ 12.) However, New clarifies in her deposition that, while employed at Thermo, she believed the two were not peers, despite being "peers on the GLT," as she no longer reported to Lagarde. (Doc. 87-66 at 296:15-23.) There is no evidence that Utiger had a supervisory role, or other responsibility, over New. Of note, New claims she was not Utiger's peer in band level at Thermo, as Utiger was a band 13, and that she "supported Utiger." (Docs. 87-66 at 183:17-19; 87 at 5 n.38; 86-14.) However, as noted infra, she simultaneously claims she was "demoted" to band level 12 when she received a Job Architecture letter in August 2018 -- less than two months before she left Thermo. (Doc. 87 at 25.)

dismissed a female candidate New proposed and recommended a male for Held's position. (Doc. 87-8 ¶ 2.)

Upon Thermo's acquisition of Patheon, Utiger became Thermo's President of North America ("NA") on January 1, 2018. (Doc. 87-69 at 19:4-12.) His team included three women: Toni Sweeney, NA Human Resources Business Partner; Jillian Otto, who was also the Business Manager on New's team supporting NA; and Amanda Bosse, General Manager for Cincinnati. (Docs. 87-3 ¶¶ 14, 35; 87-68 at 20:15-25; 86-39 at 35:2-17.) Even though he had not worked with some of these women before (Docs. 87-67 at 13:9-14:11; 87-68 at 27:9-13), Utiger claimed they were "suddenly poor performers [that] need[ed] to be moved to other roles."[8] (Doc. 87-66 at 137:3-15.) Utiger was known as a "direct" and "results oriented leader" who was "equally difficult" for both men and women to work with if he believed his standards were not being met. (Docs. 86-39 at 35:2-18 (noting Utiger was "pretty direct" and "equally difficult for [another male-led] business"); 86-42 at 296:14-22 ("[Utiger] had a pattern of if he did not like the way somebody performed, he was incredibly difficult to work with."); 86-43 at 247:21-248:7 (describing Utiger as "results oriented" and "straight to the point"); 86-45 at 264:7-11 (noting Utiger had

---

[8] Utiger also complained about at least one other women who worked for him. (Doc. 87-3 ¶ 12 (calling Laura Parks, New's direct report under OneSource, a "waste" and complaining that she was lazy and added no value to the organization).)

9

"differences" with many at Thermo, including men).) At one point, these three women complained to Jewett about Utiger's "harsh" practice of "call[ing] people out" about their poor job performance in public meetings. (Doc. 87-62 at 41:17-42:6.) Utiger was counseled about his behavior (id. at 41:5-15) but reacted by inappropriately demanding to know who on his team had complained (id. at 301:8-16). Utiger would eventually recommend Bosse to be his successor, noting she was "the only one on the team that could actually run the business" based on her "extensive experience in business management" at multiple levels. (Doc. 90-15 at 173:1-15.)

Additionally, even though he never supervised New, Utiger had strong opinions about New's job performance. (Doc. 87-66 at 131:13-23.) Utiger routinely called New "unqualified" and "incompetent," claimed she lacked "the skills to do the job," and made other derogatory comments directly to her and to fellow GLT members. (Id. at 129:1-130:1, 157:16-158:11.) Utiger believed New did not have the requisite experience and technical skills to handle Business Management or OneSource, complained to Lagarde that the data she presented was not accurate, and called New "a waste of SG&A [sales, general management and administration expenses]" to her face. (Docs. 87-69 at 71:14-20, 102:6-18; 87-3 ¶¶ 7, 9.) When New transitioned to the newly established Business Management position, "Utiger worked with other business unit

10

leaders to lobby" Lagarde to eliminate her role because the "function was not needed." (Doc. 87-3 ¶ 10.) New, who lived and worked in North Carolina, normally encountered Utiger, who lived in Maryland, when they were both a part of business meetings multiple times a week (Docs. 86-46 at 107:3-21; 87-69 at 219:12-16), and he did not, according to New, interact with her enough to have an educated opinion on her performance or the intricacies of her position. (Doc. 87-66 at 131:17-23.)

New would confront Utiger and ask him for "feedback" on how "to do a good job." (Id. at 129:5-11.) Despite her efforts, Utiger made "repeated attempts to try to displace [New] and . . . take away functions from [her.]" (Id. at 226:12-15.) Utiger believed each business unit should control its business management, and he was unhappy with the process that created the Global Business Management function. (Doc. 86-48 at 68:9-17.) In early 2018, Utiger made a presentation to the GLT to move a significant function from Global Business Management, under New, back to the local NA sites, under Utiger. (Doc. 87-69 at 114:14-116:2.) Utiger was "very critical of the business management function" and "critical of what" business management was doing. (Doc. 86-45 at 223:2-25.) Fellow executives on the GLT disagreed with him and described Utiger's tenacious campaign for his preferred organizational structure as "one step forward, two steps back," "distracting," "trivial," and even a "waste of time and

11

resources."[9]  (Docs. 87-19, 87-20, 87-21.)

New had "weekly complaints about [her] from [Utiger]" that she would raise with Lagarde and Mike Jewett, the head of Human Resources for PSG.  (Doc. 87-66 at 14:22-24, 117:18-21.)  Beginning around January 2018, New attributed the pattern of Utiger's actions to animus against women.  (Id. at 43:1-18.)  She would discuss the "harassment" from Utiger "at least on a monthly basis" with multiple Thermo executives, including Lagarde, Negron, and Jewett, and with Human Resources employees.  (Id. at 44:12-45:17, 117:23-118:11.)  New also heard rumors that Utiger had called her "the queen," and other women "princesses," behind her back.  (Id. at 160:3-18.)  When New twice confronted Utiger about these comments, Utiger told her, "You weren't supposed to hear it."  (Id. at 161:1-6.)

Lagarde was aware of New's issues with Utiger at Patheon because Utiger complained about New's job performance directly to Lagarde.  (Id. at 126:5-19.)  Others at Thermo perceived a "toxic" relationship between New and Utiger.  (Docs. 87-67 at 123:23-124:6; 87-62 286:12-287:1.)  In the spring of 2018, New spoke with Jewett about Utiger's pattern of behavior with women, and Jewett told New that Marc Casper, Thermo's CEO, was aware of the

---

[9] Negron and Lagarde disagreed with Utiger and had "contentious conversations" concerning his "very strong position" of how the organization should be structured.  (Docs. 86-45 at 121:14-122:14; 86-43 at 187:15-22.)

complaints and that Jewett and Lagarde would address them.[10] (Doc. 87-8 ¶ 3.)

In April 2018, during a conversation with New about Otto's potential successor, Utiger rejected a female candidate because "she would be having children and could not do the job" and its required travel. (Doc. 87-3 ¶ 15.) In May 2018, following this conversation, Utiger contacted Jewett about a "threat" he received from New about working with women and a statement to the effect that HR was questioning his "drive for diversity." (Doc. 87-32.) Jewett emailed New about it, and New denied she made a threat or discussed HR, but she reiterated her concern about Utiger's "inappropriate comments" and "attempts to disparage." (Id.) She forwarded this email exchange to Negron, who said he "hopes this stops soon." (Id.) In September 2018, Otto and New complained to Jewett about Utiger's inappropriate conduct during a business meeting, and Otto's "ongoing and difficult relationship with [another employee] and secondarily with [Utiger]." (Doc. 87-26.) A subsequent investigation by Thermo found Utiger was "rude and adversarial with certain employees" and "exhibits a negative attitude toward [Otto]." (Id.) Otto and New disagreed on whether Utiger's behavior was based on sex. (Doc. 87-67 at 115:2-25.)

---

[10] Thermo notes that Jewett has maintained that, during his conversations with New about Utiger's behavior, she "[made] it clear that this [was] not a gender issue" and "affirmately [sic] added that it was not a gender issue." (Doc 87-14 at 10.) However, for the purposes of summary judgment, the court views the facts in the light most favorable to New.

Jewett ultimately failed to address New's issues (Doc. 87-66 at 226:7-9), and Utiger's behavior did not change while New was employed at Thermo (id. at 304:13-16).

### 4. New's Departure from Thermo

Throughout 2018, PSG was undergoing Human Resources Review and Job Architecture. (Doc. 87-62 at 197:20-198:1.) Human Resources Review was an annual process for evaluating talent and considering future job assignments. (Id. at 191:12-23.) The Job Architecture process, by contrast, evaluated PSG roles to fit them into Thermo's job structure, post-acquisition, "banding" positions within pay levels and assigning job titles. (Id. at 68:1-14, 273:9-12.) Division Presidents, upon the change in control, were integrated into Thermo at band level 13 and thus were not included in the Job Architecture process. (Id. at 98:5-23; Doc. 86-13.)

In May 2018, during Human Resources Review, Casper, Lagarde, and other talent evaluators identified multiple possible next roles for New within Thermo, including the position of Vice President, General Manager, Supplements within the BioProduction Division (the "BPD" job or role) at a company Thermo was in the process of acquiring.[11] (Docs. 87-37; 87-63 at 91:6-24.) New was identified as a "top talent" who was "extremely important to the

---

[11] The BPD role would be in Thermo's Life Sciences Group, which was outside of PSG. (Docs. 87-63 at 91:11-17; 86-29 at 3.)

organization," and had "high potential" to reach "the highest levels in the organization." (Docs. 87-60 at 165:23-25; 87-65 at 138:8-9, 141:9-15, 153:1-7.) She was also rated "high risk" because Thermo was "concerned" about losing her to another organization as she was "difficult to replace externally." (Doc. 87-65 at 144:5-22.) While Thermo knew that New was unable to accept a relocation (Docs. 87-66 at 265:20-25; 87-63 at 72:14-20; 87-65 at 99:2-18),[12] the Human Resources Review group was looking for a position that matched New's long-term career development goals of running a business unit and moving to another division. (Docs. 86-22; 86-26; 86-46 at 252:9-254:7.) The BPD role would require relocation, but not until after one year (Doc. 86-29), and it would allow New to have full control over profits and losses (Doc. 86-26), which was another of her career developmental goals (Doc. 86-22).

In early May 2018, unbeknownst to Thermo, New told the former CEO of Patheon that she felt Thermo was too "bureaucratic," so she was "amping up the [job] search process." (Doc. 86-27.)

In early June, Lagarde told New of the potential BPD job. (Doc. 87-41.)

In June 2018, as a part of Job Architecture, Thermo analyzed the cost of long-term incentives flowing from banding

---

[12] New was "very clear" a relocation would have resulted in a divorce and loss of her children. (Doc. 87-66 at 323:5-8.)

recommendations and determined that PSG was top-heavy with executives (band levels 11-13). (Doc. 87-33.) New's Business Management role was identified as one of the positions to be "re-assessed as she moves into her next role." (Id.) Other roles from the GLT that were identified for further review or "re-band[ing]" included Negron's Commercial role from band 13 to band 12 and a Vice President and General Manager role in Thermo's "Soft Gels" division to band 11. (Id.; 87-65 at 169:5-9.) By June 19, it was determined that Thermo would "not backfill[] [New's role] when she moves on." (Doc. 87-34.)

New's responsibilities changed over time. New's direct report under OneSource left sometime in late 2017, and the team reported directly to her. (Doc. 86-46 at 28:16-18, 29:12-30:19.) In March 2018, New's integration team lead was arrested and consequently placed on leave. (Id. at 74:15-75:24.) Thereafter, the integration team reported directly to New. (Id. at 32:8-11.) In March or April, New was notified that she would begin to lose her responsibility over Cognizant because Thermo moved those services inhouse. (Id. at 35:11-21, 97:6-98:6.) New also lost her Shared Services responsibility (for back-office services) in May. (Doc. 87-3 ¶ 17.) And sometime before July 2018,[13] Thermo

_____

[13] In her deposition, New could not identify a precise time this responsibility was moved. (Doc. 86-46 at 73:22-24.)

16

moved some client-facing responsibilities from New's project-management team inhouse. (Docs. 86-46 at 73:1-21; 1-1 at 153.)

In June 2018, New once again approached Jewett about concerns about Utiger's behavior. (Doc. 87-3 ¶ 18.) Shortly thereafter, she was removed from in-person attendance at Quarterly Business Reviews with the CEO and asked to dial in with most of the attendees.[14] (Id.; Docs. 1-1 at 153; 90-5.) On July 16, 2018, New met with Lagarde to express her concern that those at Thermo, including Lagarde himself, were diminishing her role within the company. (Doc. 87-66 at 54:10-21.) At this meeting, Lagarde admitted that he was reducing New's responsibilities in her best interest and that he had no upcoming executive positions available in PSG. (Id. at 54:22-55:9.) However, he advised New he was "owning" her career development and that he was putting New forward for positions elsewhere. (Id. at 99:16-20.) During the discussion, Lagarde said he would not intend to make a contractual payout to her. (Id. at 99:21-25.) New also told Lagarde that her issues with Utiger were causing heart palpitations, to which

---

[14] To the extent New places her removal from Quarterly Business Reviews in mid-July instead of mid-June (Doc. 87 at 14), this would contradict her previously sworn declaration (Doc. 87-3 ¶¶ 18-19). See Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").

Lagarde replied her issues were "fake news."[15]  (Id. at 15:11-18.)

The following day, July 17, New met with Jewett, who told her there was no job for her in PSG but that they were looking for other available job options for her.  (Id. at 55:23-56:8.)  That same day, New received an email asking her to dial into Quarterly Business Reviews and not to attend in-person.  (Doc. 90-5.)  Then on July 20, she was advised by the leader of the M&A group that Lagarde had removed her from further involvement in Thermo's investigation into an acquisition of Alster.  (Doc. 87-3 at ¶ 18.)  At Patheon, New "had been the internal lead" during Patheon's due diligence work in investigating an Alster acquisition in 2017, but she was "not included" when Thermo began its own Alster inquiry in May 2018.  (Id.; Doc. 1-1 at 153.)  Thermo had its own M&A team, and M&A was not a part of New's Business Management duties.  (Doc. 87-66 at 58:19-59:3.)

On July 23, New's counsel sent a letter to Thermo "in accordance with the 'Good Reason' provision in her Employment Agreement."  (Doc. 87-43.)  The letter contended that New's change in reporting relationship (putting Negron between her and Lagarde) was a "significant change" constituting "Good Reason" under her Employment Agreement.  (Id.)  Further, the letter claimed material

---

[15] New's July 16 meeting notes do not reference issues with Utiger other than in the context of a disagreement between New and Utiger about Business Management responsibilities.  (Doc. 90-7.)

reductions in her duties and responsibilities, including "the recent elimination of her role and involvement in leading mergers and acquisitions, shifting of responsibilities of carve-outs to peers, the removal of the integration lead as a direct report and elimination of the function and role, [and] elimination of project management office responsibilities including management of Cognizant and outsourced operations." (Id.) The letter also stated that New and her counsel "would like to open a constructive dialogue to discuss [New's] transition period and transfer of information and responsibilities, and her severance benefits." (Id.)

On August 22, New received an August 16, 2018 letter from Jewett explaining Thermo's Job Architecture changes and advising that her "job profile title" would be "Vice President, Business Management" with a band level of 12. (Doc. 1-1 at 138.) That same day, Thermo's 30-day "cure period" under New's Employment Agreement that was triggered by the July 23, 2018 letter from New's counsel expired.

On August 27, 2018, New's counsel emailed Thermo's counsel suggesting they discuss a separation arrangement. (Doc. 1-1 at 139.) On September 5, 2018, Thermo offered New the BPD job outside of the PSG group, but this position would eventually require her to relocate and would result in reductions in title, band level, reporting level, and compensation (through the loss of a 2019

19

synergy bonus). (Id.) New turned down the offer the next day, and her counsel communicated her rejection to Thermo because the "reporting, duties, responsibilities and compensation are not comparable to her current role" and the position required relocation. (Id. at 148.) New's counsel also informed Thermo that New would be leaving the company effective November 2, 2018. (Id.) In response, Thermo advised New's counsel that New's position "had not changed" and Thermo did not agree that the "Good Reason" provision of her contract was triggered. (Id. at 147.)

On September 10, in a pre-scheduled call to discuss the BPD offer, Casper attempted to persuade New to take the BPD job despite her insistence that she could not relocate. (Doc. 87-66 at 308:13-20.) Thermo maintained that relocation was not required until after New's son graduated high school, over a year away. (Docs. 86-46 at 227:14-228:10; 86-27.) Casper told her that if she did not take the position, he had no other available job for her in the organization and it would be "unfortunate" if she left the company on negative terms after her successful time building Patheon. (Id. at 309:2-11.) Casper asked New to trust him and Lagarde, but New told him that she could not do so because Lagarde had yet to fix Utiger's harassment. (Id. at 310:13-311:6.) Casper ended the conversation by telling New that he had "no job for her," so she should work with Lagarde and Jewett on her exit. (Id. at 309:19-23.)

Following her conversation with Casper, New spoke with Jewett about her separation, and Jewett followed up with a September 20 letter with a severance inconsistent with the "Good Reason" benefits in her contract. (Doc. 87-51 at 2.) In his correspondence, Jewett informed New that the August 16 Job Architecture letter was sent erroneously, and her job title, position, and responsibilities remained the same. (Id.)

The Job Architecture was implemented October 1, slotting New at a band level of 12; system title of Vice President, Business Management; and business title of Group Vice President, Enterprise-Wide Operations. (Doc. 87-52.) On October 2, New's counsel sent a letter to Thermo outlining some of the issues New had encountered at the company, including – for the first time in writing – her issues with Utiger, and advising that New would be leaving her employment effective October 5, 2018.[16] (Doc. 1-1 at 152-154.)

Throughout her time at Thermo, New's position and compensation never changed, and she maintained her spot on the GLT until she left on October 5, 2018. (Doc. 86-46 at 32:3-32:15, 81:16-82:15, 195:11-15.) New never received the "Good Reason" severance benefits outlined in her Employment Agreement, and her

---

[16] New left at that time because she believed she was "told to leave" by Casper. (Doc. 86-46 at 186:22-187:2.) New tried to work on her severance with Jewett but contends she had "no choice but to leave" once he "took a significant period of time to get back to [her]." (Id. at 187:5-11.)

stock options and RSUs that were to vest immediately upon her termination by Thermo without Cause, or by New with "Good Reason," were removed from her investment account. (Doc 87-3 ¶ 38.)

On November 21, 2018, New filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging employment discrimination that took place beginning in May 2018. (Doc 86-34.)

### B. Procedural History

New filed an eight-count complaint on August 7, 2019, alleging the following: Unlawful Sex Discrimination and Harassment, in violation of Title VII, 42 U.S.C. § 2000e-2(a) (Count I); Hostile and Abusive Working Environment, in violation of Title VII (Count II); Unlawful Retaliation, in violation of 42 U.S.C. § 2000e-3(a) (Count III); Breach of Contract regarding Severance and Other Benefits (Count IV); Breach of Contract regarding Stock Options and RSU's (Count V); Conversion (Count VI); Fraud (Count VII); and Failure to Pay Wages and Benefits when Due, in violation of the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et seq. (Count VIII). On September 30, 2019, along with its answer to New's complaint (Doc. 10), Thermo filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) (Doc. 8), which this court granted in part, dismissing the fraud claim without prejudice, and denied in part on August 7, 2020 (Doc. 13). Following discovery, Thermo filed the present summary

22

judgment (Doc. 73), which is fully briefed (Docs. 86, 87, 90) and ready for decision.

## II.  ANALYSIS

### A.  Standard of Review

A court must grant a motion for summary judgment if the pleadings, depositions, and affidavits submitted show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Under this standard, a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. As a result, the court will only enter summary judgment in favor of the moving party when the record "shows a right to judgment with such clarity as to leave no room for controversy" and clearly demonstrates that the non-moving party "cannot prevail under any circumstances." Campbell v. Hewitt, Coleman & Associates, Inc., 21 F.3d 52, 55 (4th Cir. 1994) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact-finder] functions . . ." Anderson, 477 U.S. at 255. On summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

23

favor." Id.  However, "only reasonable inferences from the evidence . . . in light of the competing inferences to the contrary" should be considered by the court.  Sylvia Development Corp. v. Calvert County, Maryland, 48 F.3d 810, 818 (4th Cir. 1995) (citations omitted).  In evaluating material submitted in support of or in opposition to a motion for summary judgment, the court may reject inadmissible evidence.  See Fed. R. Civ. P. 56(c)(4); Evans v. Technologies Applications & Service Co., 80 F.3d 954, 962 (4th Cir. 1996).

While the movant bears the initial burden of demonstrating that there are no genuine disputes of material fact, once that burden has been met, the non-moving party must demonstrate the existence of a genuine dispute of material fact.  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 521 (4th Cir. 2003); Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  A mere scintilla of evidence is insufficient to circumvent summary judgment.  Anderson, 477 U.S. at 252; Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (noting that there is an affirmative duty for "the trial judge to prevent factually unsupported claims and defenses from

24

proceeding to trial" (citation omitted)).  Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. Anderson, 477 U.S. at 248-49.  Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question."  Mitchell v. Data General Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993).

### B.  Employment Agreement Claims

#### 1.  Good Reason

New raises four claims stemming from her Employment Agreement: Breach of Contract regarding Severance and Other Benefits (Count IV); Breach of Contract regarding Stock Options and RSU's (Count V); Conversion (Count VI); and Failure to Pay Wages and Benefits when Due, in violation of the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et seq. (Count VIII).  As this court previously stated, to maintain her claims for breach of contract under her "Good Reason" provision, New must demonstrate a genuine dispute as to whether a material reduction in her duties or responsibilities occurred between July 7, 2018 (ninety days prior to her termination) and July 23, 2018 (the date of her notice to Thermo), and Thermo must have had until August 22, 2018 to cure.  (See Doc. 13 at 13-14.)

Thermo argues that none of the "Good Reason" events outlined in New's July 23 letter occurred between July 7 and July 23, 2018.

25

(Doc. 86 at 18-21.)  Thermo further argues that the alleged events in her July 23 letter do not constitute "Good Reason" as defined by her Employment Agreement.  (Id. at 21-24.)  In response, New contends that she had "Good Reason" pursuant to both the "[1] elimination of her role as confirmed by Lagarde during their July 16 meeting and [2] her exclusion from further work on Alster and M&A."  (Doc. 87 at 21-23.)  In reply, Thermo argues that New has "narrowed her Good Reason claim to a single event," and that her involvement with Alster was "limited" and "continued . . . after July 23."  (Doc. 90 at 10-12.)  Thermo characterizes New's interpretation of the phrase "elimination of her role" in the July 23 letter as novel and contends it "clashes with basic grammar" and "calls for an unreasonable inference" that New's Business Management position had been eliminated on July 16.  (Id. at 12-13.)

Under North Carolina law, interpretation of a written and unambiguous contract is a question of law for the court.  Briggs v. American & Efird Mills, Inc., 111 S.E.2d 841, 843 (N.C. 1960).  "Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution."  Lane v. Scarborough, 200 S.E.2d 622, 624 (N.C. 1973).  When construing contractual terms, a contract's plain language controls.  See DeLoach v. Lorillard Tobacco Co., 391 F.3d 551, 558 (4th Cir. 2004) (noting that "as

26

under general principles of contract law, our task is to 'give ordinary words their ordinary meanings.'" (quoting Internet East, Inc. v. Duro Communications, Inc., 553 S.E.2d 84, 87 (N.C. Ct. App. 2001)); Walton v. City of Raleigh, 467 S.E.2d 410, 411 (N.C. 1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract."). "If the contract is ambiguous, however, interpretation is a question of fact and resort to extrinsic evidence is necessary." Crider v. Jones Island Club, Inc., 554 S.E.2d 863, 866 (N.C. Ct. App. 2001) (citations omitted). An ambiguity may exist if the language is "fairly and reasonably susceptible to either of the constructions asserted by the parties." Glover v. First Union National Bank of North Carolina, 428 S.E.2d 206, 209 (N.C. Ct. App. 1993); see also Crawford v. Potter, 2005 WL 2452092, at *4 (M.D.N.C. Oct. 4, 2005) (unpublished) ("Ambiguity is not created merely by a difference of opinion between the parties on the issue of what certain terms mean." (citing Wachovia Bank & Trust Co. v. Westchester Fire Insurance Co., 172 S.E.2d 518, 522 (N.C. 1970))). In determining whether language is ambiguous, "words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible." Anderson v. Anderson, 550 S.E.2d 266, 269-70 (N.C. Ct. App. 2001) (citation omitted).

Here, the contractual language at issue is the "Good Reason" definition: "a material reduction of the Executive's duties or

responsibilities that is inconsistent with the Executive's position as described in this Agreement (i.e. <u>that would result in a de facto reduction in rank</u>)." (Doc. 1-1 at 4 (emphasis added).) This language makes clear that the parties did not intend for *any* responsibility or duty to constitute "Good Reason." Rather, New must demonstrate a genuine dispute as to whether such reduction was material enough to be so inconsistent with her position that losing it "would result in a de facto reduction in rank" of Group Vice President, Enterprise-Wide Operations.[17] (Doc. 1-1 at 23.)

New argues that her removal as a team member on the Alster acquisition project is sufficient to trigger the "Good Reason" provision of her contract. As Thermo contends, the record does not support this. As Group Vice President, Enterprise-Wide Operations, New was neither a member of Thermo's corporate M&A team, nor did she "lead" M&A, all facts she knew in taking the Thermo job.[18] (Docs. 86-46 at 58:19-59:3, 61:3-18; 87 at 22.) She was not initially involved with the Alster project at Thermo when it began in May 2018. (Doc. 1-1 at 153.) At Thermo, New oversaw

---

[17] In her original contract with Patheon, New's position is described as "Senior Vice President, Human Resources." (Doc. 1-1 at 18.) But New is listed as Group Vice President, Enterprise-Wide Operations in her offer letter from Thermo, and any aspects of her employment that were "inconsistent with specific terms" of her initial employment agreement with Patheon are "governed by the terms of [the signed August 2017 letter agreement.]" (<u>Id.</u> at 23.)

[18] New's statement that Lagarde had promised her that she would be on his "internal deal team" would not alter this conclusion, as it never materialized.

Global Business Management, which took up at least 80% of her time (Docs. 86-16; 87-14 at 10; 87-66 at 60:22-61:2; 86-43 at 48:15-49:1), and mergers and acquisitions was a separate function conducted by a separate group that was not a core part of those responsibilities (Doc. 86-46 at 58:25-59:3, 71:10-15). New does not present evidence indicating how much time she spent on the Alster acquisition at Thermo.[19] The only evidence in the record reflects that New's Alster role at Thermo was "limited" and took "a couple hours at max," as the "predominate scope of her role was knowledge transfer from the original Patheon due diligence effort." (Doc. 86-44 at 147:16-148:7). New was not a part of management-level meetings that occurred in April and June 2018. (Doc. 86-44 at 148:8-20.) Thus, the fulfillment of her duty transferring knowledge of her prior Alster work to Thermo's M&A

---

[19] When asked in her deposition how much time she spent on mergers and acquisitions, New's answer was nonresponsive. She noted it "fluctuated" and cited Jewett's testimony for the proposition that mergers and acquisitions would take up "20 percent" of her time. (Doc. 86-46 at 59:4-12.) However, as New admits, and taking the facts in the light most favorable to her, Jewett's "20 percent" answer included not just mergers and acquisitions, but other duties such as project management and working with outside vendors, *combined with mergers and acquisitions*, only excluding her primary Business Management role. (Id. at 59:15-19, 60:21-61:2; Doc. 87-14 at 10; see also Doc. 87-3 ¶ 6 (combining M&A responsibilities with "Carve Outs, Integrations, and Strategic Projects" under New's "Project Management Office" umbrella of responsibilities).) Further, it is undisputed that the "leading mergers and acquisitions" portion of her Good Reason letter was a reference to her alleged removal from the Alster acquisition team around July 2018 (Doc. 86-46 at 57:4-10, 72:4-13), and New does not testify that she spent any significant amount of time or involvement on the Alster project prior to her removal. She merely notes that – while employed at Patheon – she led the team that conducted the due diligence work on Alster back in 2017. (Id. at 58:3-11.)

team would not "result in a de facto reduction in rank" of her Group Vice President, Enterprise-Wide Operation position.[20]

Additionally, New's counsel argues that "[t]he phrase 'elimination of her role' in the Good Reason letter concerned Lagarde's admission on July 16 that he was eliminating New's job" and not solely her work in M&A.[21] (Doc. 87 at 22.) While the elimination of New's job would constitute "Good Reason," it is undisputed that New's job was not eliminated in July 2018. (Docs. 1-1 at 149-50; 87-65 at 188:3-189:15.) Indeed, New remained in her position, and continued to receive the same compensation, until she resigned in October 2018. (Doc. 87-46 at 81:16-82:15.) Therefore, even if Lagarde "eliminated" New's role in July 2018,[22] Thermo "cured" this defect by the end of the cure period in paying

---

[20] Though the extent is unclear, there is evidence in the record that New's limited role with Alster continued after July 23, 2018. (Docs. 86-46 at 67:20-68:6; 90-8.) Ultimately, Thermo reduced the Alster acquisition to a carveout "related to softgels." (Doc. 87-64 at 126:19-127:20, 151:10-25.)

[21] The letter's relevant text lists New's harms as: "the recent elimination of her role and involvement in leading mergers and acquisitions, shifting of responsibilities . . . to peers, the removal of the integration lead . . . and elimination of the function and role, elimination of project management office responsibilities including management of Cognizant and outsourced operations, just to name a few." (Doc. 1-1 at 136.) In her deposition, New testified that the "recent elimination of her role and involvement in leading mergers and acquisitions" portion of her Good Reason letter was a reference to her alleged removal from the Alster acquisition team around July 2018. (Doc. 86-46 at 57:4-10, 72:4-13.)

[22] Thermo notes that New's July 16 meeting notes do not refer to any job loss. (Doc. 90-7.) However, for the purposes of summary judgment, the court views the facts in the light most favorable to New.

30

her to continue as Group Vice President, Enterprise-Wide Operations. (<u>See</u> Doc. 1-1 at 5 (noting Thermo may "cure . . . within thirty (30) days after receiving such notice")).

For these reasons, the court finds that the "elimination of [New's] role and involvement in leading mergers and acquisitions" does not constitute "Good Reason" pursuant to the terms of her Employment Agreement. Therefore, New has not demonstrated a genuine dispute as to whether an event which would trigger "Good Reason" occurred between July 7 and July 23, 2018, the relevant period under the Employment Agreement.

### 2. Termination "Other than for Cause"

In the alternative, New argues that Thermo breached her Employment Agreement by terminating her "other than for Cause" when Casper told her there was no job for her and she should "work on her exit." (Doc. 87 at 20-21.) She further contends that Thermo's severance offer is consistent with "a policy that only applies if [Thermo] eliminated her position," and therefore a material dispute exists to whether she was terminated. (<u>Id.</u> at 21.) In response, Thermo argues that her interpretation of Casper's comments "conflicts with her repeated statements about her resignation" and that the discussion was in the context of her repeated representations that she wished to resign. (Doc. 90 at 13.) Ultimately, New argues that the inference that she was fired after her conversation with Casper is reasonable. Again, the

31

record does not support such a contention.  See Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir. 1958), cert. denied, 358 U.S. 908 (1958) ("Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.").

New's proffered inference removes the conversation with Casper from the surrounding context.  This conversation took place following months of communications from New and her counsel that she wished to resign from Thermo with "Good Reason" if her concerns were not addressed.  (Doc. 1-1 at 136 (July 2018: "we would like to open a constructive dialogue to discuss her transition period and transfer of information and responsibilities, and her severance benefits"), 139 (August 2018: "we need to focus our discussion on her separation"), 148 (September 2018: "[The BPD role] is not a position she can accept. . . . The Good Cause referenced in our prior communications has not been cured . . . [so] [c]ontinuing with the company is not something she is interested in.").)  Critically, this included a message from New's counsel declining the BPD offer mere days before counsel's phone call *communicating a November 2 separation date from Thermo.*  (Id. at 148 ("Continuing with the company is not something she is interested in. . . . To that end, we propose a scheduled departure date of November 2.").)  It is undisputed that "Casper simply

32

interpreted New's rejection of the BPD job as a resignation."
(Doc. 87 at 18.)

Second, there is no communication from Thermo asking or
directing New to leave or informing her that her position was
eliminated by a certain date. To the contrary, Thermo made clear
she could continue in her current position. (Doc. 1-1 at 150
("your current position has not been eliminated and your job
responsibilities remain the same").) It was New's counsel, not
Thermo, who voluntarily proposed a November 2 separation date (id.
at 148), followed by an earlier date of October 5 once her
severance demands were not being met (id. at 154).

Finally, New points to Thermo's September 2018 severance
offer as evidence that Thermo was terminating her without cause.
(Doc 87 at 21.) This inference ignores the plain language of
Thermo's communication. (See Doc. 1-1 at 150 "while you are not
eligible . . . [Thermo] is willing to offer you a separation
payment . . . to achieve an amicable resolution of your
concerns"). It also ignores the only context: that New had
indicated she intended to leave Thermo. See Scott v. Harris, 550
U.S. 372, 380 (2007) ("When opposing parties tell two different
stories, one of which is blatantly contradicted by the record, so
that no reasonable jury could believe it, a court should not adopt
that version of the facts for purposes of ruling on a motion for
summary judgment."). For these reasons, New has not produced

33

evidence that gives rise to a genuine dispute that Thermo terminated her other than for cause.

New has thus failed to demonstrate a genuine dispute of material fact as to her claims for Breach of Contract regarding Severance and Other Benefits (Count IV) and Breach of Contract regarding Stock Options and RSU's (Count V). Consequently, Thermo's motion for summary judgment as to those claims will be granted.

### 3. Conversion and Wage and Hour Act Claims

New's claim for conversion (Count VI) and North Carolina Wage and Hour Act (Count VIII) arise out of the rights stemming from her Employment Agreement. New acknowledges as much. (Doc. 87 at 24 (stating that New's "wage payment and conversion claims are inextricably tied to her breach of contract claims").) As to conversion, she alleges that Thermo "wrongfully converted [her] vested Stock Options and RSUs by removing them, or causing their removal, from [her] Fidelity account" and "effectively prevent[ed] [her] from exercising her vested Stock Options and RSUs in accordance with the terms and conditions of the Employment Agreement." (Doc. 1 ¶¶ 153, 154.) As for her Wage and Hour Act claim, she alleges that her "severance pay, bonuses and other benefits and [her] vested [Thermo] Stock Options and RSUs constitute wages due, and [Thermo] failed to pay [her] all wages due upon the termination of her employment in violation of the

34

North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. §§ 95-25.1 et seq."  (Id. ¶ 166.)  As to both claims, she contends she is entitled to recovery because "she terminated her employment for Good Reason or was terminated [by Thermo] 'other than for Cause.'" (Doc. 87 at 24.)

In North Carolina, "[a] claim for conversion 'requires (1) an unauthorized assumption and exercise of right of ownership over property belonging to another and (2) a wrongful deprivation of it by the owner, regardless of the subsequent application of the converted property.'"  Lockerman v. South River Electric Membership Corp., 794 S.E.2d 346, 354 (N.C. Ct. App. 2016) (quoting North Carolina State Bar v. Gilbert, 663 S.E.2d 1, 4 (N.C. Ct. App. 2008)).  The Wage and Hour Act defines "wage" as "compensation for labor or services rendered by an employee whether determined on a time, task, piece, job, day, commission, or other basis of calculation" and provides that "[f]or the purposes of G.S. 95-25.6 through G.S. 95-25.13 'wage' includes sick pay, vacation pay, severance pay, commissions, bonuses, and other amounts promised when the employer has a policy or a practice of making such payments."  N.C. Gen. Stat. § 95-25.2(16).  Under the act, an employer is obliged to pay wages, including bonuses and commissions, when due.  Id. § 95-25.6.  However, an employee must have "earned" the wages and benefits to have a claim under the act.  See Hamilton v. Memorex Telex Corp., 454 S.E.2d 278, 282-83

(N.C. Ct. App. 1995); Myers v. Roush Fenway Racing, LLC, No. 1:09CV508, 2009 WL 5215375, at *5 (M.D.N.C. Dec. 28, 2009), report and recommendation adopted in part, rejected in part, No. 1:09CV508, 2010 WL 2765378 (M.D.N.C. July 12, 2010) ("The North Carolina courts have consistently interpreted the Act to exclude recovery of future, unearned wages.").

Here, because New has failed to establish a genuine dispute of material fact as to whether Thermo breached the Employment Agreement entitling her to the various benefits she seeks, her conversion and Wage and Hour Act claims necessarily fail. In other words, Thermo did not wrongfully convert her benefits, nor were they earned wages under the act. Thermo's motion for summary judgment on Counts VI and VIII will accordingly be granted.

## C. Title VII

New's remaining causes of action allege violations of Title VII stemming from the behavior of Utiger. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). New alleges that Thermo violated Title VII in three ways: Unlawful Sex Discrimination and Harassment (Count I); Hostile and Abusive Working Environment (Count II); and Unlawful Retaliation (Count III). Each basis for relief will be addressed in turn.

36

### 1. Unlawful Sex Discrimination/Harassment

A plaintiff may prove discrimination under Title VII "either through direct and indirect evidence of [discriminatory] animus, or through the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Foster v. University of Maryland-Eastern Shore, 787 F.3d 243, 249 (4th Cir. 2015), abrogated on other grounds by University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338 (2013); Diamond v. Colonial Life & Accident Insurance Co., 416 F.3d 310, 317-18 (4th Cir. 2005) (noting that a plaintiff may either establish that her protected status, though not the sole reason, was a "motivating factor" for her adverse action, or use the McDonnell Douglas burden-shifting framework). New submits no direct evidence of discrimination. (See Doc. 87 at 25.) Instead, she advances her Title VII discrimination and retaliation claims under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Lightner v. City of Wilmington, 545 F.3d 260, 264-65 (4th Cir. 2008) (applying McDonnell Douglas framework to Title VII sex and race discrimination claims). Under the McDonnell Douglas framework:

> [T]he plaintiff-employee must first prove a prima facie case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the prima facie case "drops

37

out of the picture" and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

Evans v. Technologies Applications & Service Co., 80 F.3d 954, 959 (4th Cir. 1996) (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993)).  At the second step, the defendant's burden is one of production, not persuasion.  St. Mary's Honor Center, 509 U.S. at 509.  The ultimate burden of proving "the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Id. at 507 (citation omitted).  Under the McDonnell Douglas framework, the plaintiff must develop some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action.  Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).  If a plaintiff fails to establish a prima facie case of discrimination or fails to raise a genuine dispute about the employer's legitimate, non-discriminatory explanation for the alleged discriminatory act, the defendant is entitled to summary judgment. Henson v. Liggett Group, Inc., 61 F.3d 270, 276 (4th Cir. 1995).

To establish a prima facie case of discrimination on this claim, New must prove by a preponderance of the evidence: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."

38

Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).  Here, the first two elements are clearly met because New, a woman, is a member of a protected class (sex), and she has presented substantial evidence of satisfactory job performance.

### a. Adverse Employment Action

For the third element, an "adverse employment action" is "a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (citations omitted).  In determining what constitutes an "adverse employment action," there must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (citation omitted); cf. James, 368 F.3d at 376-77 (finding no adverse action in a discrimination claim, noting it was "significant" that an employee "retained his position . . . and received the same pay, benefits, and other terms and conditions of employment").  Whether an action is adverse depends on the facts relating to it as judged from the perspective of a reasonable person in the plaintiff's position, considering all circumstances.  See Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 71 (2006).

With this framework in mind, each proffered employment action

will be addressed in turn.

### i. Diminished Responsibilities

New claims Lagarde's "diminishing" of her role constituted an adverse employment action. This includes her removal from in-person Quarterly Business Reviews, her exclusion from the Alster acquisition project, and the removal of various direct reports, including "the removal of the integration lead [PMO] as a direct report and elimination of the function and role, elimination of project management office responsibilities including management of Cognizant and outsourced operations." (Doc. 87 at 12-15, 25.)

New first claims her change from in-person to remote Quarterly Business Reviews constitutes an adverse action because it deprived her of an opportunity "to get feedback on . . . performance" and "to have face time" to "meet with senior leadership." (Doc. 87 at 12 (quoting Doc. 87-64 at 119:17-23).) However, she does not offer any evidence of how feedback received from attending the meeting remotely – with the majority of attendees – is of lesser value, or even completely nonexistent, and any implication of adverse consequences from a mere lack of feedback or "face time" is purely speculative. James, 368 F.3d at 377 (rejecting a discrimination claim based on exclusion from "important meetings" because it "lack[ed] specificity" and "fail[ed] further to substantiate how the alleged exclusions, whatever they might have been, adversely affected him"); cf. Adams v. Anne Arundel County Public Schools,

40

789 F.3d 422, 431 (4th Cir. 2015) (noting that "reprimands and poor performance evaluations . . . are much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent"); Forkkio v. Powell, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002) ("Purely subjective injuries . . . are not adverse actions.").

New next bases her claim on her not being involved in mergers and acquisitions and Thermo's Alster acquisition project. The court has already addressed this claim in detail, and for the reasons noted concludes that the loss of any opportunity related to mergers and acquisitions does not constitute an "adverse employment action."

Finally, New cites her loss of direct reports. Her direct report under OneSource left sometime in late 2017, and the team then instead reported directly to her. (Doc. 86-46 at 28:16-18, 29:8-30:19.) Then in March 2018, New's integration team lead was placed on leave following her arrest. (Id. at 74:15-75:24.) Thereafter, the integration team also reported directly to New. (Id. at 32:8-11.) In neither case did New lose any responsibility, just the intermediary who reported to her. In March or April, New was notified that she would begin to lose her responsibility overseeing the company's relationship with a vender, Cognizant, because Thermo moved the services that Cognizant was providing

41

inhouse. (Id. at 35:11-21, 97:6-98:6.) New also lost her Shared Services responsibility (for back-office services) in May. (Doc. 87-3 ¶ 17.) And sometime before July 2018, Thermo moved some client-facing responsibilities from New's project-management team to a sales leader inhouse. (Docs. 86-46 at 73:1-21; 1-1 at 153.)

While it is undisputed New held these various duties, responsibilities, and direct reports immediately after acquisition, these progressive changes did not have an impact on her employment conditions equivalent to "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Hoyle, 650 F.3d at 337 (citation omitted). New retained her position as Group Vice President, Enterprise-Wide Operations, received the same compensation, and maintained her spot on the GLT until she left on October 5, 2018. (Doc. 86-46 at 32:3-32:15, 81:16-82:15, 195:11-15.) Additionally, none of these changes had an impact on her Global Business Management function, which took up at least 80% of her time.[23] (Docs. 86-16; 87-14 at 10; 87-66 at 60:21-61:2; 86-43 at 48:15-49:1.).

### ii. Job Architecture "Demotion"

Next, New contends the August 16 Job Architecture letter

---

[23] While the court takes the facts in the light most favorable to New, Thermo has maintained that these various changes in duties were "de minimis" and occurred "organically" as PSG was "absorbed into Thermo" following acquisition. (Docs. 87-14 at 8; 86-43 at 48:15-24.)

reduced her title and band level and demoted her. Although conduct
"short of ultimate employment decisions can constitute adverse
employment action," there must be a "tangible effect on the terms
and conditions of employment." James 368 F.3d at 375-77 (citations
omitted). Here, the Job Architecture letter had no practical
effect on New, as it is undisputed that her position, title, and
compensation did not change from the time the Job Architecture
letter was sent, to when it was made effective on October 1, 2018,
to when she resigned four days later, on October 5, 2018.[24] (Doc.
86-46 at 32:3-32:15, 81:16-82:15.) Cf. Ajayi v. Aramark Business
Services, Inc., 336 F.3d 520, 531 (7th Cir. 2003) (holding an
employee could not establish a prima facie case of discriminatory
demotion under Title VII because "a memorandum stating that her
position was being eliminated and that she would be demoted two
weeks later" which never materialized was "[a]n unfulfilled
threat, which results in no material harm, [and] is not materially
adverse"); cf. James, 368 F.3d at 377 ("[A] poor performance
evaluation is actionable only where the employer subsequently uses
the evaluation as a basis to detrimentally alter the terms or
conditions of the recipient's employment." (citation omitted));
Dickerson v. SecTek, Inc., 238 F. Supp. 2d 66, 75 (D.D.C. 2002)
("In sum, then, the effect of [plaintiff's] demotion (if it can be

---

[24] For these reasons, the fact that the Job Architecture letter was issued
in August and retracted as allegedly erroneously sent is immaterial.

called that) was simply never felt.  It was a[] hypothetical employment action, not an actual one, and thus does not satisfy the requirements of the *prima facie* case.").

Even if there were some future change in benefits between the band levels, see James, 368 F.3d at 376 ("The question is whether there was a change in the terms or conditions of [plaintiff's] employment which had a significant detrimental effect on [plaintiff's] opportunities for promotion or professional development" and "speculation about the future adverse consequences . . . may not rise to the level of a genuine dispute" (citation omitted)), there is insufficient record evidence to create a genuine dispute that New was ever a "band 13" at Thermo so as to have been demoted.  Banding did not exist at Patheon, and the Job Architecture process was a method to attempt to slot Patheon employees into the Thermo compensation structure.  Vice Presidents and Group Vice Presidents, such as New, were not offered a "band 13" level in their offer letters upon acquisition, only "Presidents," who had a superior title.  (Compare Docs 86-8, 86-9, 86-10, 86-11, 86-12, 86-15, 86-35 with Docs. 86-13, 86-14.) Band 13 level executives did not participate in the banding process (see Doc. 87-62 at 98:2-23), and other than the levels which were assigned early, banding did not occur until the Job Architecture process was completed and implemented on October 1, 2018.  (Doc. 90-12 at 12:20-13:25.)  The record reflects that New was considered

44

a band 12 during the Job Architecture process.  (See Doc. 87-34.)
New also testified that Utiger (a president and band level 13) was
not a "peer" because he was a different band level, among other
reasons.  (Doc. 87-66 at 181:23-182:6, 183:17-22.)

New cites two things for her claim she was a band 13 employee
and thus demoted in the Job Architecture process.  First, she says
that before the merger, in June or July of 2017, Thermo's Van
Walsum told her she would be a band 13.  (Id. at 172:21-173:21.)
Specifically, she says, Van Walsum explained that band 13 was
"where most of the direct reports at this level to a business
leader like Michel [Lagarde] are."  (Id.)  Before getting to the
merit of the alleged oral statement, it is notable that it is
inadmissible to determine the terms of New's employment.  See
Lassiter v. Bank of North Carolina, 551 S.E.2d 920, 923 (N.C. Ct.
App. 2001) ("The parol evidence rule prohibits the admission of
parol evidence to vary, add to, or contradict a written instrument
intended to be the final integration of the transaction." (citation
omitted)).  And New's fraud claim based on this very allegation
(Count VII) was previously dismissed without prejudice, pursuant
to Federal Rule of Civil Procedure 9(b), and has not been
realleged.  (Doc. 13 at 20-24.)  Even assuming its truth, however,
this alleged statement fails to support her claim as it was
allegedly made before Negron was put in place between New and
Lagarde in December 2017, such that New thereafter no longer

45

reported directly to Lagarde.

The facially closer question is New's citation to Negron's deposition testimony where he stated that a band 12 would be a reduction in band and title for New. (Doc 87-65 at 81:13-18.) But on closer inspection this is insufficient to create a genuine dispute of a material fact for several reasons. First, there is no basis in the record that Negron had any foundation to draw this conclusion. He admittedly was not involved in the Job Architecture banding process or familiar with Thermo's banding system for New and other Group Vice Presidents. (Id. at 81:2-11, 199:2-15; see Docs. 87-33; 87-62 at 197:20-198:7.) Second, as noted, there is no evidence that New had previously been assigned a band level at Thermo from which she would be demoted. (See, e.g., Docs. 87-34; 87-66 at 183:17-22.) In fact, the record reflects the opposite. If New had been a band 13, it would make her Negron's "peer" in band level, which is contrary to the fact he was New's direct supervisor. (Docs. 86-13; 86-16.) Finally, New was not placed in a band until the Job Architecture went into effect, and she presents no evidence that anyone involved in the Job Architecture process ever considered her a band 13. (Doc. 90-12 at 13:2-13.) While Negron testified that the "vice president" title on the August 16 letter would be a reduction, it is clear it does not reflect the reality of what Thermo was implementing. The Job Architecture slotted New as a "vice president" within the new

46

banding system, but there is no dispute that Thermo confirmed to New on September 20th that "your job title of 'Global Vice President, Enterprise-Wide Operations' will not change." (Doc. 1-1 at 150.)

Thus, while the court may not make credibility determinations at this stage, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), the contention New was ever a band 13 at Thermo is simply unsupported by the record. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

### iii. BPD Offer

New also argues the BPD offer was a demotion because it would require her to relocate (which she could not) and would result in reductions in title, band level, reporting level, and compensation (through the loss of a 2019 synergy bonus). (Doc. 87 at 15-16, 25.) However, as discussed above, the record reflects that New was not terminated, and the BPD offer was just that – an offer. New freely rejected the offer, and she was told she could remain in her current position. See James 368 F.3d at 377 (an adverse action must have a "tangible effect on the terms and conditions of employment"); cf. Laird v. Fairfax Cty., Virginia, 978 F.3d 887,

47

895 (4th Cir. 2020) (holding, in the Americans with Disabilities Act context, that "a transfer is not an adverse action when it is voluntarily requested and agreed upon"); see also Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001) (holding that "the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action").

### iv. Casper "Termination"

New also claims her alleged termination by Casper constitutes an adverse employment action. To be sure, if New was in fact terminated, it would constitute an adverse employment action. Roberts v. Glenn Industrial Group, Inc., 998 F.3d 111, 123 (4th Cir. 2021) ("'Discharge' from employment is one form of adverse employment action"). However, for the reasons discussed in section II.B.2. supra, her employment was never terminated. New resigned. See Evans v. Davie Truckers, Inc., 769 F.2d 1012, 1014 (4th Cir. 1985) (A Title VII claim requires adverse employment action, which does not occur where plaintiff voluntarily resigns); cf. Stone v. University of Maryland Medical System Corp., 855 F.2d 167, 173 (4th Cir. 1988) ("If [an employee] resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within

48

the meaning of the due process clause.").[25]

For these reasons, New has failed to present evidence of a genuine dispute as to whether she suffered an adverse employment action.

### b. Inference of Unlawful Discrimination

The fourth element of a discrimination claim -- requiring that plaintiffs plausibly plead an inference of discrimination -- is often satisfied by identification of a comparator. See, e.g., Okusami v. Maryland Department of Health & Mental Hygiene, No. ELH-18-1701, 2020 WL 5500167, at *23-24 (D. Md. Sept. 11, 2020). New is "'not required as a matter of law to point to a similarly situated . . . comparator in order to succeed' on a discrimination claim." Laing v. Federal Express Corp., 703 F.3d 713, 720 (4th Cir. 2013) (quoting Bryant v. Aiken Regional Medical Centers Inc., 333 F.3d 536, 545-46 (4th Cir. 2003) ("[Plaintiff] is not required as a matter of law to point to a similarly situated white comparator in order to succeed on a race discrimination claim. We would never hold, for example, that an employer who categorically refused to hire black applicants would be insulated from judicial

---

[25] Additionally, New claims her interaction with Utiger, and Thermo's response, constitutes a constructive discharge. The Fourth Circuit has yet to expressly rule on the question of whether constructive discharge constitutes an independent cause of action. See, e.g., Perkins v. Int'l Paper Co., 936 F.3d 196, 203 n.1 (4th Cir. 2019) (noting lack of clarity in the district court regarding whether constructive discharge was a separate cause of action but declining to rule on the issue). For the reasons discussed infra, New was not constructively discharged.

49

review because no white applicant had happened to apply for a position during the time frame in question." (citation omitted))). However, where a plaintiff relies on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, "[t]he similarity between comparators . . . must be clearly established in order to be meaningful." Lightner v. City of Wilmington, North Carolina, 545 F.3d 260, 265 (4th Cir. 2008) (rejecting comparison evidence as "too loose" because plaintiff and comparator held different job positions).

Here, even assuming New suffered an adverse employment action, she fails to provide evidence that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. New bases her sex discrimination claims on her disparate treatment compared to male GLT colleagues. (Doc. 87-26.) While a comparison between employees "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances," Haynes v. Waste Connections, Inc., 922 F.3d 219, 223 (4th Cir. 2019) (citation omitted), if a plaintiff "seeks to establish a prima facie case of . . . discrimination by pointing to" a comparator, "[t]he similarity between comparators . . . must be clearly established in order to be meaningful." Lightner, 545 F.3d at 265. Overall, "[c]ourts must look at all relevant factors in determining whether . . . employees are in fact similarly

50

situated." Robinson v. Volvo Group North America, LLC, 65 F. Supp. 3d 458, 463 (M.D.N.C. 2014). The inquiry is whether the would-be comparator's commonalities are such that, taken together with the other prima facie evidence, a jury could reach an inference of discrimination. See Ajayi, 336 F.3d at 531-32 (declining to consider supervisory employee and nonsupervisory employee as similarly situated); Pense v. Maryland Department of Public Safety & Correctional Services, No. PWG-17-1791, 2020 WL 5946574, at *3 (D. Md. Oct. 7, 2020) ("The purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel." (citation omitted)).

New claims she was "treated differently from her male GLT colleagues" as "she was the only GLT member not directly reporting to Lagarde," her "male colleagues did not have the same type of conflicts with [fellow GLT member] Utiger," she was "the sole GLT member to receive a [Job Architecture] letter . . . demot[ing] her," and no fellow GLT member was "given the ultimatum [she] received: relocate for a lesser position or hit the road." (Doc. 87 at 26.) In response, Thermo argues that New "does not point to any similarly-situated male [Group Vice President] who was treated differently." (Doc. 90 at 3.)

New's claim presupposes the status of "GLT member" as sufficient to meet the comparator requirement. However, while the

other GLT members were males and thus outside the protected class (Doc. 87-62 at 187:14-17), the record indicates that such comparison is "too loose." Lightner, 545 F.3d at 265. As New testified in her deposition, members of the GLT are not sufficiently similar to be considered "peers" in many key respects. (See Doc. 87-66 at 181:10-14.) Members may be "peers" on the GLT but have different band levels, job titles, and reporting levels, and they receive various levels of compensation,[26] perform diverse functions, and bear different levels of responsibility in the organization. (Id. at 183:10-22; see also Doc. 87 at 5 n.38.) New has not presented evidence of any specific male GLT member with whom to compare her treatment, such as a comparator that was also a Group Vice President with a similar job function and reporting level. Therefore, the court finds there are too many variables to fairly compare "GLT members" generally to allow a jury to reach an inference of discrimination.

For these reasons, New has failed to present evidence of a genuine dispute as to whether she received different treatment from similarly situated employees outside the protected class.

### c. Thermo's Proffered Legitimate, Non-Discriminatory Reasons

Even assuming New was successful in establishing her prima

---

[26] New was one of the highest compensated Group Vice Presidents on the GLT. (See Docs. 86-33; 86-35.)

facie case of discrimination, the burden would then shift to Thermo to articulate some legitimate, non-discriminatory reason for each of the asserted adverse employment actions. McDonnell Douglas, 411 U.S. at 807. Thermo has met this burden.

First, New complains she was "excluded" from Quarterly Business Reviews. (Doc. 87 at 30.) As the court has noted, Thermo has presented evidence that she was merely moved to remote attendance with the vast majority of other attendees for logistical reasons. (Docs. 87-63 at 41:18-21 (Lagarde noting attendance needed to be cut back because "there were too many people"); 87-66 at 211:10-23.)

New also complains she was removed from M&A and the Alster acquisition project, but (as also discussed above) Thermo has produced evidence showing mergers and acquisitions was not one of New's core business management functions, she was not on Thermo's M&A team, and her work on the Alster acquisition was a mere knowledge transfer from her previous involvement. (Docs. 86-44 at 147:16-148:7; 86-46 at 58:19-59:3, 71:10-15.)

Next, New contends that her role was "diminish[ed]" through the removal from various integration duties, client-facing responsibilities, and employees. (Doc. 87 at 25.) However, Thermo has produced evidence that such duties and responsibilities were moved inhouse as Patheon was becoming fully integrated into Thermo, and that they did not impact New's chief Global Business Management

53

function.  (See, e.g., Docs. 87-14 at 8, 14; 90-11 at 37:6-39:25; 87-63 at 48:15-49:1.)

New complains that her job was "identified . . . as one to be eliminated" under the Job Architecture.  (Doc. 87 at 30.)  Thermo has produced evidence that the Job Architecture program was a company-wide cost-cutting measure, which identified and assessed the positions of multiple executives and GLT members as part of the integration of PSG into Thermo, and there is no evidence that New was treated adversely compared to similar executives.  Thus, Thermo has articulated a legitimate, nondiscriminatory reason for eventually eliminating New's position following the Job Architecture process or purportedly "demoting" her position.[27]  See Atkinson v. Food Lion, LLC, 433 F. Supp. 2d 628, 634-35 (M.D.N.C. 2005), aff'd, 173 F. App'x 248 (4th Cir. 2006) (finding that the employer's proffered reason for the plaintiff's termination, that the plaintiff's department was eliminated as part of cost-cutting efforts, was a legitimate business reason); Bennett v. Charles County Public Schools, No. AW-04-1501, 2006 WL 4738662, at *3 (D. Md. May 23, 2006), aff'd, 223 F. App'x 203 (4th Cir. 2007) ("By averring that its wastewater plants were reaching the end of their useful life expectancies, and that it made business sense to

_____

[27] At the hearing on the present motion, Thermo noted, and New did not dispute, that Thermo did not eliminate New's job for over a year and a half after New resigned.

54

eliminate some plants, place others with modern facilities, and retain an independent contractor to oversee the plants that remained, Defendant has met its burden of stating a legitimate, nondiscriminatory reason for its employment decision.").

As for New's contention that Thermo "pushed the BPD job even though they understood that New could not relocate" and that it was a demotion in title, compensation, and reporting level (Doc. 87 at 30), Thermo has produced evidence that the BPD offer was meant to reflect New's high potential in the company and Thermo's desire to meet her career goal of running a business unit during the Human Resources Review process. Put another way, there are only so many jobs running a business unit available in any corporate organization, and Thermo identified one for New based on an anticipated acquisition. See supra I.A.4. Thermo has also demonstrated that the position did not require relocation until a year after the effective date in an effort to mitigate her concerns. Thus, Thermo has articulated a legitimate, nondiscriminatory reason for offering her the BPD role.

Finally, as for the claim that Casper terminated New's employment, Thermo has provided ample evidence that not only did he not do so, but he was merely responding to New's assertions, including those made through her legal counsel on seeking a departure from the company based on her asserted "Good Reason" bases of her Employment Agreement, that she wanted to run a

business unit.  Thermo has noted that other than the BPD role, it had no other available job for her in the organization meeting her desires and that if she was not interested in that offer, she should coordinate with Lagarde and Jewett on her intended departure.  (Doc. 87-66 at 309:2-23.)

### d.  Pretext for Discrimination

Because Thermo has met its burden of production, New bears the burden to establish pretext.  To survive a summary judgment motion, a plaintiff must develop some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action.  Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004).  To establish a genuine factual dispute, a plaintiff must show both that the reason offered by the defendant was false and that discrimination was the real reason.  Jiminez v. Mary Washington College, 57 F.3d 369, 378 (4th Cir. 1995).  A plaintiff can prove pretext by showing that the employer's explanation is "unworthy of credence" or by offering other forms of circumstantial evidence sufficiently probative of discrimination.  Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 211 (4th Cir. 2014); Khoury v. Meserve, 268 F. Supp. 2d 600, 615 (D. Md. 2003) ("It is not enough for Plaintiff to allege pretext based on her own view of the truth; in order to rebut Defendant's non-discriminatory reason, Plaintiff's task is to proffer evidence showing that Defendant's stated reason was not the real reason for

56

its actions."). In evaluating a plaintiff's allegation of pretext, "it is not a court's province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's [adverse employment action]." Walker, 775 F.3d at 211 (citation omitted).

New argues that Thermo's "reasons are false and pretextual." (Doc. 87 at 27-28.) But New's response does not explain how this is so. Rather, she reiterates her arguments why each action is adverse. (See Doc 87 at 27-28.) New began reporting Utiger's behavior on a monthly basis beginning in January 2018. She does not challenge Thermo's explanation for her removal from the Alster project, or that any of her responsibilities or direct reports (including one who was removed because she was arrested) as Group Vice President, Enterprise-Wide Operations were subsequently moved as an "organic" consequence of Thermo fully integrating PSG.[28] New also does not present evidence that Thermo's legitimate reason of moving the vast majority of meeting attendees to remote attendance is pretextual, other than conclusorily suggesting the timing in the summer of 2018 must have been punitive. (Doc. 87 at 14-15.) See Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir.

---

[28] Thermo's decision during the Job Architecture process not to backfill the Group Vice President, Enterprise-Wide Operations position when New "move[d] into her next role" is consistent with this reason.

1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion."); see also Walker, 775 F.3d at 211 n.3 (noting that "timing is unlikely to defeat a nonretaliatory explanation on its own").

New argues that the Job Architecture was pretextual by noting that while the August 16 Job Architecture letter was withdrawn shortly thereafter, the substance was eventually implemented unchanged on October 1, 2018. But this fails to respond to Thermo's non-discriminatory reason that Job Architecture was a company-wide cost-cutting program that identified multiple potential executive positions to be re-assessed. Thermo also proffered evidence that there are "two titles" in its system, the "business title" (chosen by the employee) and the "system title" in the Job Architecture. Thus, even if New had not resigned, her "business title" of Group Vice President, Enterprise-Wide Operations would not have changed. (Docs. 90-10 at 236:14-22, 240:1-15; 87-62 at 241:1-242:13; 1-1 at 150.) She has also not shown any other executive at her organizational level who was banded at a level 13.

Additionally, New does not offer evidence challenging Thermo's goal of offering the BPD role to further her career goal of running a business unit, other than by highlighting her inability to relocate and Thermo's failure to offer her another position before she resigned. See Bryan v. Prince George's County,

58

_Maryland_, No. DKC-10-2452, 2011 WL 2650759, at *6 (D. Md. July 5, 2011) (noting that, to demonstrate pretext, the employee "must point to facts that render the employer's reason so questionable as to raise an inference of deceit"). Of note, she highlights the "Soft Gels" role, offered to another female executive, as a possible alterative position and evidence the BPD offer was extended pretextually. (Docs. 87 at 28; 87-65 at 169:3-9.) However, this would have been a demotion to band 11 (Doc. 87-33), and New's criteria to determine which role was preferable is based on (1) her previous work related to "Soft Gels" at Patheon and (2) her personal preference to remain in PSG. (See Doc. 87 at 12 n.128.) New "cannot establish pretext by relying on criteria of her choosing when the employer based its decision on other grounds." _Anderson v. Westinghouse Savannah River Co._, 406 F.3d 248, 271 (4th Cir. 2005).

For these reasons, even if New could establish a prima facie case, she cannot demonstrate that Thermo's legitimate, non-discriminatory reason for each of the asserted adverse employment actions was pretextual. Thus, New has failed to meet her burden to produce a genuine dispute of material fact that would demonstrate discrimination. Thermo's motion for summary judgment on New's discrimination claim will therefore be granted.

### 2. Hostile and Abusive Working Environment

New's second Title VII claim alleges that Utiger's actions

59

created a hostile and abusive working environment. Thermo moves for summary judgment on the grounds that New failed to demonstrate Utiger's actions were based on sex, objectively severe or pervasive, or caused her to be constructively discharged. (Doc. 86 at 11-16.)

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations omitted). To establish a claim of hostile work environment, a plaintiff must show that she experienced harassment that was (1) unwelcome; (2) based on her protected status; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) imputable to the employer. See EEOC v. Fairbrook Medical Clinic, P.A., 609 F.3d 320, 327 (4th Cir. 2010); Jennings v. University of North Carolina, 482 F.3d 686, 696 (4th Cir. 2007) (en banc) (noting that, in reviewing hostile environment claims, "[a]ll the circumstances are examined . . . [and] [e]vidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances" (citations omitted)).

Here, the first and fourth elements are clearly met because New would discuss the "harassment" from Utiger "at least on a

60

monthly basis" with multiple Thermo executives, including Lagarde, Negron, Jewett, and with Human Resources employees. (Doc. 87-66 at 44:12-45:17, 117:23-118:11.) The question is whether New has made out a prima facie case that the alleged conduct was based on her sex and was severe or pervasive so as to constitute a basis upon which a reasonable jury could determine that Thermo had a hostile work environment.

### a.   Based on Sex

For the second element, New argues Utiger's conduct demonstrated general hostility toward women. See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998) ("A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."). Viewed in the light most favorable to New, the record supports that she was subjected to rude, petty, and abrasive behavior from Utiger. However, there is little evidence of behavior that is facially related to her sex. The vast majority of New's complaints reflect a contentious business relationship with Utiger, who was known as a "direct" and "results oriented leader," based on his opinion of her performance and the business management function. (Docs. 86-39 at 35:2-18; 86-43 at 247:21-248:7; 86-48 at 67:16-21.) Utiger had "contentious conversations" concerning his "very

61

strong position" of the business management function not only with New, but also with Lagarde and Negron. (Docs. 86-45 at 121:14-122:14; 86-43 at 187:15-22.)

New proffers evidence of Utiger's behavior toward other women to demonstrate general hostility toward women.[29] While "the primary focus in the hostile work environment analysis is on the plaintiff's experience, evidence of how others were treated in the same workplace can be relevant to a hostile work environment claim." Perkins v. International Paper Co., 936 F.3d 196, 209-10 (4th Cir. 2019). Here, the record shows that Utiger's abrasive behavior was largely indiscriminately directed to other Thermo employees of both sexes, as female employees considered him "incredibly difficult" for both men and women to work with if he believed his high standards were not being met. (Docs. 86-42 at 296:14-22; 86-45 at 264:7-11). For example, Amanda Bosse testified that Utiger "was pretty direct and equally difficult for . . . a male led [business.]" (Doc. 86-39 at 35:2-18.) She also testified that even though it "took a while" to get used to "his style,"

---

[29] New relies on Utiger's purported statement that he "never met a woman that [he] liked." (Docs. 87 at 31; 87-2 at 2.) While such a statement could be admissible for proof of Utiger's state of mind, Fed. R. Evid. 803(3), Thermo correctly objects to the use of the evidence as inadmissible because of multiple levels of hearsay – Goodfellow allegedly learned from Jewett who allegedly learned from Lagarde who allegedly heard from Utiger (Doc. 90 at 8). See Maryland Highways Contractors Ass'n, Inc. v. State of Md., 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.")

62

Bosse did not believe Utiger's behavior was gender related. (Doc. 90-9 at 54:5-17, 64:3-17.) Similarly, Jillian Otto testified that even though Utiger was clearly a "jerk[]" and "difficult to work with," his behavior was not based on her sex. (Doc. 90-14 at 115:22-116:5.) Furthermore, Toni Sweeney testified in her deposition that she believed problems stemmed from Utiger's "dismissive and very demanding" demeanor, especially when "he was not on board with an approach." (Doc. 87-68 at 128:17-129:14.) She noted that Utiger "wanted individuals on his team . . . to be very direct . . . to create a natural tension" because "he felt it would elevate the business." (Id. at 77:5-10.) However, she disagreed with his approach because she could be "just as effective" without being "nasty." (Id. at 77:5-25.)

Next, New points to the rumors that Utiger had on at least two occasions told others that she was "the queen" and other women were "princesses." These isolated incidents occurred over the course of a year -- once in "the fall of 2017" and again "in the spring of 2018." (Doc. 86-46 at 160:3-13.) Thermo points out that there is no claim or evidence that Utiger ever uttered these words to New.

Finally, New highlights Utiger "seeking to replace Held with a man" (Doc. 87 at 33), his rejection of an internal female candidate New proposed to replace Jillian Otto, and his comment that the candidate "would be having children and could not do the

63

job" and its required travel. (Doc. 87-3 ¶ 15.) New proposes
that his comments about Otto's potential replacement and his
recommendation of a man to fill Held's position instead shows
animus against women in the workplace. (Docs. 87-8 ¶ 2; 87 at 9.)
Thermo responds that this inference is plainly contrary to Utiger's
subsequent recommendation of Bosse – a woman – to be his eventual
successor because he viewed her as "the only one on the team that
could actually run the business" based on her "extensive experience
in business management" at multiple levels. (Doc. 90-15 at 173:1-
15.) However, even assuming that Utiger's motivation for rejecting
Otto's potential successor was avoiding someone who he felt "could
not do the job" which required travel (Doc. 87-3 ¶ 15), the basis
of his reasoning – that potentially having children might prevent
the female candidate from travelling – may reflect a prejudiced
view toward women. See, e.g., 42 U.S.C.A. § 2000e(k) ("The terms
'because of sex' or 'on the basis of sex' include, but are not
limited to, because of or on the basis of pregnancy, childbirth,
or related medical conditions."); Woods v. City of Greensboro, 855
F.3d 639, 651 (4th Cir. 2017) (holding that "imposing unique
burdens or stereotypical expectations on an individual based on
her membership in a protected group is illicit discrimination,"
including the "stereotypical assumption that pregnant women will
eventually require substantial absences from work" (citation
omitted)).

The question is whether this conduct amounts to general hostility toward women in the workplace, including New, or rather relates to a professional disagreement over New's job performance. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 191 (4th Cir. 2004) (holding a "hostile work environment claim fails because it is based on professional frustrations, not personal racial attack"); Adefila v. Select Specialty Hospital, 28 F. Supp. 3d 517, 525 (M.D.N.C. 2014) (holding that a "stray '[Nigerians are] cannibals' remark — even if considered by the court — cannot transform a garden variety dispute between an employee and her supervisor into a Title VII claim"). No doubt Utiger's isolated comments of "princess" and "queen" are based on sex, and his assessment of a female replacement for Otto and recommendation of a man to fill Held's position may have been. While the remaining comments and conduct attributable to Utiger are certainly rude, petty, boorish, and abrasive, the court need not reach a firm conclusion whether they also are based on sex because, for the reasons that follow, New fails to demonstrate they are severe or pervasive.

**b.   Severe or Pervasive**

To satisfy the third element of a hostile work environment claim, New must establish that Utiger's behavior was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere.   New argues that Utiger's conduct

65

was severe or pervasive due, in part, to his general hostility toward women as demonstrated by his (1) recommendation of a man to fill Held's position; (2) "immediate" criticisms of Sweeney and Otto despite never working with them before; (3) complaint of "harsh" behavior from Sweeney, Otto, and Bosse; and (4) "rude and adversarial" and "negative attitude toward [Otto]." (Doc. 87 at 32-34.) Additionally, she argues his "constant disparagement and criticisms" -- such as calling New a "queen" and other women "princesses," and regularly telling people New had "no skills," and was "incompetent," "unqualified," and a "waste of resources" -- created a "contentious" and "toxic" relationship that was abusive. (Id. at 34.) Furthermore, she argues Utiger's "abuse impacted [her] work performance" because his criticisms were "without justification" and were described by others as "one step forward, two steps back," "distracting," "trivial," and even a "waste of time and resources." (Id.) In response, Thermo argues that Utiger's "toxic" relationship with New concerning her job performance, and his isolated statements referring to her as a "queen" and other women as "princesses" behind her back, are insufficient to establish an objectively abusive work environment. (Doc. 90 at 7-8.)

Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." Oncale, 523 U.S. at 81. The ultimate

determination has both objective and subjective elements and is made by examining the totality of the circumstances, which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23 (noting that "no single factor is" dispositive); see Perkins, 936 F.3d at 211 (while courts may "discuss[] the evidence offered by [a plaintiff] in categories" they still must "consider the totality of the plaintiff's experiences in evaluating whether an environment is severe or pervasive")

Title VII was not intended to create a general workplace civility code. See Jennings v. University of North Carolina, 482 F.3d 686, 717 (4th Cir. 2007) (Niemeyer, J., dissenting) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). As such, it "does not provide a remedy for every instance of verbal or physical harassment in the workplace." Murray v. City of Winston-Salem, 203 F. Supp. 2d 493, 499 (M.D.N.C. 2002) (quoting Lissau v. Southern Food Service, Inc., 159 F.3d 177, 183 (4th Cir. 1998)). Plaintiffs must "clear a high bar in order to satisfy the severe or pervasive test." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions

of employment." Id. (quoting Faragher, 524 U.S. at 788). On summary judgment, the court must "identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion." Id. at 316. "The more severe the harassment, the less pervasive it needs to be, and vice versa." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 284 (4th Cir. 2015) (quoting Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring)).

As discussed above, New has established that those at Thermo were subjected to rude, petty, and abrasive behavior from Utiger. But such allegations fail to rise to an actionable level under Title VII. See Evans v. International Paper Co., 936 F.3d 183, 192 (4th Cir. 2019) ("[R]ude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII."); Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006) ("[The plaintiff] merely complains of rude treatment by [his colleagues] — conduct falling short of that required to sustain a hostile work environment claim."); Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (holding that the plaintiff did not state a hostile work environment claim despite allegations of "callous behavior by her superiors"). New does not allege any physically threatening conduct, unwanted touching, or offensive sexist language used in her presence. See Boyer-Liberto,

68

786 F.3d at 277; Evans, 936 F.3d at 192 ("[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." (quoting Sunbelt Rentals, Inc., 521 F.3d at 315)).

The record, when viewed in the light most favorable to New, shows she encountered Utiger at business meetings a few times a week beginning in September 2017 (Doc. 86-46 at 107:3-21). But even New contends that Utiger did not interact with her enough to have an educated opinion on her performance or the intricacies of her position. (Doc. 87-66 at 131:13-23.) New first points to the rumors she heard from other GLT members that Utiger had called her "the queen," and other women "princesses," but these two isolated incidents took place months apart over the course of over a year and outside of New's presence. See Perkins, 936 F.3d at 210 (noting that while "the evidence of racially offensive conduct that [plaintiff] heard about second-hand should not be disregarded simply because he did not witness it," it "does not create a genuine issue of material fact . . . because the statements are remote in time relative to each other and to [plaintiff's] decision to leave [the employer]").

New would also "usually" hear about Utiger's insults about her job performance second hand from others on the GLT, but Utiger would tell her she was "incompetent," had "no skills," or "wasn't qualified" directly at least once a week. (Doc. 87-66 at 129:1-

69

14, 157:16-158:22.)   These performance-related comments are at worst rude, disrespectful, unpleasant, or even unprofessional but fall far short of the frequent racial or sexually-demeaning comments courts have found sufficient to give rise to an abusive work environment.   Compare EEOC v. Central Wholesalers, Inc., 573 F.3d 167, 175-77 (4th Cir. 2009) (finding alleged gender-based and race-based harassment was sufficiently severe or pervasive where co-workers referred to women as "b***hes" and a co-worker in a cubicle next to the plaintiff had Playboy items, watched pornography in her presence, had a pornographic screensaver, and placed a screwdriver in a Halloween decoration in a sexual manner more than once; and where co-workers frequently used racial epithets, some directed at the plaintiff, and two co-workers "kept blue-colored mop-head dolls in their offices which they had hanging by nooses tied around the dolls' necks") and Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184-85 (4th Cir. 2001) (holding that supervisor's constant, even daily, use of racial epithets was sufficiently severe or pervasive to survive summary judgment) and Amirmokri v. Baltimore Gas & Electric Co., 60 F.3d 1126, 1131 (4th Cir. 1995) (hostile work environment survived summary judgment where Iranian plaintiff was "intentionally . . . embarrass[ed]" with impossible tasks and called offensive names like "local terrorist" on a daily basis) with Walker, 775 F.3d at 205-06, 210 (finding a "near-daily" barrage of targeted vulgarities persisting

70

for over a year, such as a male co-worker regularly grabbing his crotch and saying "these nuts are looking for you"; referring to the plaintiff as "fresh meat"; and suggesting that if another male co-worker "want[ed] a blow job" he should go join the plaintiff where she was working, to be "simply too close to that line for summary judgment to be appropriate") and Singleton v. Department of Correctional Education, 115 F. App'x 119, 120-22 (4th Cir. 2004) (unpublished) (affirming summary judgment where the harasser "made offensive comments, showed [the plaintiff] unwanted attention that made her uncomfortable, and continuously expressed a sexual interest in her" for over a year "approximately four times a week," as "conduct that [the plaintiff] complains of, though boorish and offensive, is more comparable to the kind of rude behavior, teasing, and offhand comments that we have held are not sufficiently severe and pervasive to constitute actionable sexual harassment") and Skipper v. Giant Food, Inc., 68 F. App'x 393, 399 (4th Cir. 2003) (unpublished) (no racially hostile work environment where plaintiff was exposed to daily racist graffiti, overheard white co-workers using racial slurs 13 times over four years, and referred to by manager with a racial slur).[30]

Further, Utiger and New were both members of the GLT. It was

---

[30] While the Fourth Circuit does not accord precedential value to its unpublished opinions, it has noted that "they are entitled only to the weight they generate by the persuasiveness of their reasoning." See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (citation omitted).

in this "peer" context that Utiger made his comments to others and to New about New's job performance and her Business Management function.  (Doc. 87-66 at 158:23-159:4, 159:15-22.)  Although Utiger was her superior in many respects, he was not her supervisor and he never managed her.  (Id. at 131:13-20) Boyer-Liberto, 786 F.3d at 278 ("[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character." (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 763 (1998))); see Vance v. Ball State University, 570 U.S. 421, 424 (2013) ("[A]n employee is a 'supervisor' for purposes of vicarious liability under Tide VII if he or she is empowered by the employer to take tangible employment actions against the victim."); Howard v. Winter, 446 F.3d 559, 566 (4th Cir. 2006) ("The fact that [defendant] was her superior in rank, however, [is] not enough to show that he [is] her supervisor for purposes of Title VII.").  As for Utiger's comment of "queen," it is true that infrequent uses of gender or racially-charged language can establish a hostile work environment if the offensive action was sufficiently severe. See, e.g., Boyer-Liberto, 786 F.3d at 278, 280 ("[A] reasonable jury could find that [a supervisor's] two uses of the 'porch monkey' epithet . . . were severe enough to engender a hostile work environment.").  But here, unlike in Boyer-Liberto, Utiger is not New's supervisor, these comments were made outside of her presence, and he did not use the equivalent of an explicit, odious

racial slur that would support the finding that the comment, standing alone or in conjunction with the other conduct, established a hostile work environment.

Finally, even crediting New's characterization of Utiger's treatment as a whole as "abusive," the record compels the conclusion that while New's relationship with Utiger may have been "toxic," he treated many (of both sexes) with whom he worked in a similar manner. To be sure, no employee is required to endure unlawful discrimination, and one who does should not be prejudiced because of his or her willingness to tolerate it. But here New continued to do her job well and remained on the GLT for over a year despite her "toxic" relationship with Utiger. Moreover, New authorized her counsel to send a Good Reason letter, and she continued to communicate with Thermo to address her issues, in the sincere hope that she would remain with the company. (See Doc. 1-1 at 136, 139, 148, 152-54; see also Doc. 87-66 at 306:24-307:11 (New "thought very highly of" PSG and Thermo and "wanted to stay and grow").) Accordingly, regardless of how unpleasant Utiger may have made the work environment, his conduct does not appear to have unreasonably interfered with her work performance or desire to remain a part of Thermo or PSG.[31] See Bass, 324 F.3d at 765

---

[31] It is notable that New's argument that the BPD offer was an adverse action is based in part on her claimed desire to remain in PSG despite Utiger's behavior. See supra II.C.1.d.

("The words 'hostile work environment' are not talismanic, for they are but a legal conclusion[.]").

For these reasons, New has failed to present evidence of a genuine dispute that Utiger's conduct was sufficiently severe or pervasive to support a claim of hostile work environment. Thermo's motion for summary judgment as to New's hostile work environment claim will therefore be granted.

### c. Constructive Discharge

New also contends that Utiger's alleged unlawful conduct caused her to resign. Thermo responds that she has failed to present evidence that a reasonable person would have felt compelled to resign and thus be constructively discharged.

To establish constructive discharge, New must show "(1) the deliberateness of [Thermo's] actions, motivated by [sexist] bias, and (2) the objective intolerability of the working conditions." Freeman v. Dal-Tile Corp., 750 F.3d 413, 425 (4th Cir. 2014) (citation omitted). Mere "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Honor, 383 F.3d at 187 (citation omitted); see Evans, 936 F.3d at 193 (noting that constructive discharge requires "something more" than a hostile work environment). "To establish a constructive discharge claim, a plaintiff must show 'that [s]he was discriminated against by h[er] employer to the point where a

74

reasonable person in h[er] position would have felt compelled to resign.'" Evans, 936 F.3d at 193 (quoting Green v. Brennan, 136 S. Ct. 1769, 1777 (2016) (noting that "difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign")).

Here, as New has not demonstrated she was subjected to a hostile work environment, "it necessarily follows that [s]he cannot show constructive discharge." Perkins, 936 F.3d at 212. While Utiger's behavior toward New was rude, boorish, and insensitive, it was not "to the point where a reasonable person in her position would have felt compelled to resign." Evans, 936 F.3d at 193 (citation omitted); Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) (concluding allegations that plaintiff's "supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back" failed to establish "the objectively intolerable working conditions necessary to prove a constructive discharge"); Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 272-73 (4th Cir. 2001) (co-worker ostracism, denial of a management position, and mandatory counseling for turning in an inaccurate time card would not have compelled a reasonable person to resign); Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994) (noting that even a "slight decrease in pay coupled with some loss of supervisory

75

responsibilities is insufficient evidence of constructive discharge" (citation omitted)).

Moreover, it is significant that New did not work on Utiger's team or even report to him. Thus, her interactions with him were more limited. This is reflected by the reality that her counsel did not raise Utiger's behavior with Thermo for weeks, and not until counsel's final communication before New's October 5 separation (Doc. 1-1 at 152-54), and New does not cite Utiger's behavior as a reason for her departure in her deposition (Doc. 86-46 at 186:22-187:11 (New claims she left at that time because she believed she was "told to leave" by Casper and had "no choice but to leave" once Jewett "took a significant period of time to get back to [her]" about her severance)). Rather, New expressed a desire to remain with Thermo and PSG, even though Utiger's behavior did not change before she left. (Id. at 304:13-16, 306:24-307:11.) Cf. Evans, 936 F.3d at 194 (holding workplace conditions could not objectively "rise to the level of intolerability required by Supreme Court and Fourth Circuit precedent," even though they were "frustrating and unpleasant," where plaintiff stated in a resignation letter that she had a "great experience" that was "on the whole, satisfying and productive").

For these reasons, New has failed to present evidence of a genuine dispute that she was constructively discharged.

### 3. Retaliation Claim

New's final Title VII claim alleges that Thermo retaliated against her for reporting Utiger's actions throughout 2018.[32] Thermo moves for summary judgment on the ground that New failed to establish an adverse action or a causal link between her alleged reporting and an adverse action. (Doc. 86 at 17.)

Employers are prohibited from "retaliating against an employee for complaining about prior discrimination" or participating in a protected activity. Foster, 787 F.3d at 249; Baqir, 434 F.3d at 748, 747 n.16 (4th Cir. 2006) (citing 29 C.F.R. § 1614.101(b)). Title VII retaliation claims require a showing that the action would not have happened "but-for" the plaintiff's protected activity. Nassar, 570 U.S. at 360. A plaintiff may prove retaliation "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of McDonnell Douglas." Foster, 787 F.3d at 249. To establish a retaliation claim using direct and indirect evidence, a plaintiff must present "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Jacobs v. North Carolina Administrative Office of the Courts, 780 F.3d 562, 577–78 (4th Cir. 2015) (citation omitted). Here, New has not presented

---

[32] New's EEOC Charge of Discrimination alleges discrimination beginning in May 2018. (Doc 86-34.)

any direct or indirect evidence of conduct reflecting a discriminatory attitude that would bear directly on her alleged adverse actions.

To state a prima facie claim of retaliation under Title VII, a plaintiff must establish (1) engagement in a protected activity; (2) a materially adverse action; and (3) a causal connection between the protected activity and the asserted materially adverse action. Strothers v. City of Laurel, 895 F.3d 317, 327 (4th Cir. 2018); Hinton v. Virginia Union University, 185 F. Supp. 3d 807, 825–31 (E.D. Va. 2016) (citing Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). In the context of a retaliation claim, a "protected activity" is an employee's participation in an ongoing investigation or proceeding under Title VII, or an employee's opposition to discriminatory practices in the workplace. Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998); 42 U.S.C.A. § 2000e-3(a). For the second element, the "'materially adverse action' standard is explicitly less restrictive than the 'adverse employment action' standard for discrimination claims" because while "'adverse employment actions' in the discrimination context must 'affect employment or alter the conditions of the workplace,' a 'materially adverse action' in the retaliation context need not impact conditions in the workplace to be actionable." Hinton, 185 F. Supp. 3d at 826 (quoting White, 548 U.S. at 62); Cravey v. Hill,

No. 1:17-CV-1014, 2018 WL 4471732, *5 (M.D.N.C. Sept. 18, 2018).
Rather, a materially adverse action is one that "well might . . .
dissuade[ ] a reasonable worker from making or supporting a charge
of discrimination." White, 548 U.S. at 68 (citation omitted).
Upon this showing, the burden shifts to the defendant to produce
evidence that its actions were not retaliatory. Foster, 787 F.3d
at 250 (4th Cir. 2015). If the defendant does so, then the
plaintiff must show by a preponderance of the evidence that the
defendant's asserted grounds for taking its action were a pretext
for retaliation. Id. When proceeding under the burden shifting
framework, the "but for" standard is met by showing pretext and
that discrimination was the "real reason for the challenged
conduct." Id. at 252 (citation omitted) (noting "Nassar does not
alter the legal standard for adjudicating a McDonnell Douglas
retaliation claim," as "the McDonnell Douglas framework has long
demanded proof at the pretext stage that retaliation was a but-
for cause of a challenged adverse employment action"); accord
Guessous v. Fairview Property Investments, LLC, 828 F.3d 208, 216–
17 (4th Cir. 2016) (noting that the burden to show pretext merges
with plaintiff's burden of persuading the court that plaintiff was
a victim of intentional discrimination).

Here, the court assumes without deciding that New has
sufficiently established evidence to support a prima facie case.
First, her alleged "monthly" complaints of gender harassment,

79

(Doc. 87-66 at 44:12-45:17, 117:23-118:11) constitute protected activities under Title VII. <u>Laughlin</u>, 149 F.3d at 259. For the second element, New contends five separate adverse actions: (1) Lagarde diminished her responsibilities over time; (2) the August 16 Job Architecture Letter demoted her in band level and title; (3) the BPD job was offered when Thermo knew she could not accept it; (4) Casper terminated her when he told her to "work on her exit"; and (5) she was constructively discharged. The court has previously found that the Job Architecture letter did not demote her,[33] Casper's comments cannot reasonably be construed to have terminated her, and she was not constructively discharged. Moreover, the BPD job offer, which would have met New's desire to run a business unit, cannot be considered an adverse action when Thermo assured her that her position remained intact after she rejected the position. (Doc. 1-1 at 150.) However, the court can assume, without deciding, that a reasonable jury may conclude that New suffered an adverse employment action through each of these, including Lagarde's diminution of her responsibilities over time.

---

[33] Even if New believed the Job Architecture letter was at least a threat to demote her, Thermo advised her at the time it had had been erroneously sent and would have no impact. Though the Job Architecture results were eventually implemented, New has not presented any evidence that she was aware of, and thus reasonably could have been dissuaded by, either the results sent to HR employees on September 7 (Doc. 87-52) or thereafter while employed by Thermo. <u>Cf.</u> <u>Perkins</u>, 936 F.3d at 211 ("[I]nformation about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.").

And the at least "monthly" frequency of her complaints may suffice to establish causation.  Roberts v. Glenn Industrial Group, 998 F.3d 111, 123 (4th Cir. 2021); see Carter, 33 F.3d at 460 (noting that close temporal proximity may be "strongly suggestive of retaliatory motive and thus indirect proof of causation").

The burden then shifts to Thermo to articulate a legitimate, nondiscriminatory reason for each adverse employment action, and this burden is one of production, not persuasion.  Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).  Here, because the bases of liability are the same as those for her main discrimination claim, the same analysis applies, see section II.C.1.c supra, and Thermo has come forward with legitimate, non-discriminatory reasons for each of the asserted adverse actions.

New therefore bears the burden of demonstrating evidence that the employer's stated reasons were "not its true reasons, but were a pretext for discrimination." Holland, 487 F.3d at 214 (citations omitted).  In this context, she must have some evidence that her protected activity was a "but-for" cause of the adverse employment action.  Nassar, 570 U.S. at 358-61; Foster, 787 F.3d at 252 (noting the plaintiff must establish "both that the employer's reason was false and that retaliation was the real reason for the challenged conduct" (citation omitted)).

This, New has failed to do.  For the same reasons she failed to show pretext on her main discrimination claim, she has failed

to come forward with any evidence here.  Rather, she merely articulates how each action is, in her view, adverse.  There is therefore no genuine dispute that Thermo took an adverse action against her because she engaged in a protected activity. Accordingly, Thermo's motion for summary judgment on New's retaliation claim will be granted.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the Defendant's motion for summary judgment is GRANTED and this action is DISMISSED WITH PREJUDICE.

   /s/   Thomas D. Schroeder
United States District Judge

March 15, 2022